MARCIA P. BLACK *vs.* PARKER MANUFACTURING COMPANY
& others.

Norfolk.    February 4, 1952. — June 3, 1952.

Present: QUA, C.J., LUMMUS, WILKINS, SPALDING, & WILLIAMS, JJ.

*Corporation*, Officers and agents. *Fiduciary*. *Trust*, Constructive trust. *Equity Pleading and Practice*, Master: report of evidence, findings, recommittal. *Evidence*, Relevancy and materiality.

Findings by a master as to the circumstances in which one who was president, controlling executive and majority stockholder of a manufacturing corporation in good faith and successfully operated as a single enterprise that corporation and three other corporations organized and controlled by him as majority stockholder did not disclose any breach of his fiduciary duty to the manufacturing corporation through depriving it of business opportunities or any ground for holding him to be a constructive trustee for it of his stock in the other corporations.

A conclusion by a master, that salaries and bonuses paid by a corporation during the years 1940 to 1946, inclusive, to one who was its president and controlling executive in full charge of all corporate activities were not excessive or unreasonable, was supported by subsidiary facts reported showing, among other things, that the development of the corporation into a profitable enterprise and its success during those years were due mainly to his vision, skill, and hard work.

Evidence of an assignment of patent rights to a corporation by one who was its president and controlling executive and of the net amount he received from his salary after payment of income taxes was admissible on the issue of the reasonableness of his salary. [117]

Recommittal to a master for a report of evidence to test the correctness of his findings in point of fact and for additional findings lies in the discretion of the trial court. [117–118]

Rule 90 of the Superior Court (1932) does not provide a means by which a party can compel a master to report additional facts. [118]

BILL IN EQUITY, filed in the Superior Court on January 11, 1947.

The plaintiff appealed from an interlocutory decree entered by order of *Morton*, J., denying a motion to recommit to a master, and from an interlocutory decree confirming the master's report and a final decree dismissing the bill entered by order of *Fairhurst*, J.

*Arthur M. Boal*, (*Richard Bancroft* with him,) for the plaintiff.

*Loue E. Stockwell*, for the defendants.

WILLIAMS, J.   This is a bill in equity brought by a minority stockholder of Parker Manufacturing Company against Parker Manufacturing Company, Snell Manufacturing Company, American Gun Sight Co., New England Plating Co., Inc., all Massachusetts corporations, Dwight E. Priest, John Z. Buckley, Sumner B. Tilton, and Hoyt E. Battey.   The corporations are hereinafter referred to as Parker, Snell, Gun Sight, and Plating.   No service of process was made upon Battey and no complaints concerning Buckley and Tilton are now pressed.   It is alleged that Priest, while president, a director and a majority stockholder of Parker, acquired certain businesses and caused them to be taken over by Plating, Snell, and Gun Sight, corporations which he organized and controlled; that he thereby seized business opportunities which rightly belonged to Parker and exploited them for his own profit; and that, while president of Parker, he has drawn excessive and unreasonable salaries.   It is prayed that Priest and the three corporations be ordered to account to Parker for their earnings and profits; that Priest account for all salaries and dividends received by him from them; that he further account to Parker for the amount by which his salaries exceeded the reasonable value of his services; and that the shares of stock in Snell, Gun Sight, and Plating standing in Priest's name be decreed to be held in trust for Parker. The case was heard by a master.   A motion by the plaintiff to recommit his report was denied, this denial being equivalent to an interlocutory decree.   *Churchill* v. *Churchill*, 239 Mass. 443, 445–446.   *Wallin* v. *Smolensky*, 303 Mass. 39, 42.   *Kilroy* v. *O'Connor*, 324 Mass. 238, 240.   An interlocutory decree was entered confirming the report and overruling the plaintiff's exceptions, and a final decree dismissing the bill.   The plaintiff has appealed from both interlocutory decrees and from the final decree.

The facts as found by the master may be summarized as

follows. Parker is a manufacturing company located in Worcester. The defendant Priest is its president and a director. It was incorporated in 1901 as Parker Wire Goods Company, which name was changed to Parker Manufacturing Company in 1943. Its authorized capital stock is 1,250 shares of which 1,243 have been issued. One E. D. Priest was president of the corporation until his death in 1931 and owned a majority of its corporate shares. The defendant Priest, who is his son, owned 545 shares at the time of his father's death and thereafter by inheritance acquired 126 shares in 1934, making his holdings 671 shares, or a majority of the outstanding stock. In 1941 he acquired 68 additional shares from his father's estate and has since continued to hold majority control. In 1943 he transferred 91 shares to his wife and 22 shares to one Battey, an employee. The plaintiff is a sister of the defendant Priest and holds 168 shares of Parker stock received from her father's estate. Two other sisters own a like number of shares. It, therefore, appears that except for the 22 shares standing in the name of Battey, all of the issued stock is owned by Priest, his wife, and his three sisters.

Previous to 1939 Parker's business consisted largely of the manufacture and sale of items of small hardware sold mainly in large quantities at low prices and at small profit to mail order houses and chain stores. It owned some ten patents for the manufacture of appliances which Priest had invented and between 1928 and 1940 had assigned to the company without compensation. On his father's death, Priest took over the management of the business. He found the business and the finances of the company in poor condition and made efforts to improve the situation and to develop new lines both in manufacturing and in selling. He had made considerable progress in this respect when the war in Europe beginning in 1939 provided Parker with unusual additional business opportunities. "The manner in which Priest took advantage of these opportunities gave rise to the complaints now made."

Many of the items manufactured by Parker required

plating. Parker had no facilities for doing this work and was accustomed to have it done by various small concerns, which were not equipped to handle large orders promptly. Resulting delays sometimes caused cancellation of orders by Parker's customers. In 1933 when Priest, although president of Parker, had not acquired a majority of its shares, he was "instrumental" in organizing Plating for the purpose of acquiring the machinery and equipment of a certain plating plant in Worcester owned in whole or in part by one Jorjorian. Of the 51 shares issued by Plating, Jorjorian received 25 shares for his plant, Priest received 25 shares for a consideration not disclosed by the evidence, and one Soderberg received 1 share which was at once transferred to Priest. In 1934 Plating acquired Jorjorian's stock and from 1935 until 1940 Priest was its sole stockholder. In the latter year he sold 18 shares to an employee of Plating. Since 1938 Plating has occupied space in the building owned and occupied by Parker. "At no time has it been in competition with Parker." It has paid Parker from January 1, 1940, to August 31, 1947, the amount of $153,931.56 for rent, steam, electricity, and water, which payments were not "nominal." There was no evidence that these payments "were unreasonably low or that they were not fixed in good faith." There was also no evidence that the prices charged by Plating to Parker for plating work "were unreasonable or resulted in unfair profit." They have, however, produced an actual profit for Plating. In at least three out of five years (1941–1946) Plating did substantially more work for customers with which Parker had no connection than for Parker. Plating has never paid dividends and has not acquired any unreasonable surplus not needed as capital in the conduct of its business.

With the outbreak of war in 1939, Priest realized that there would be "opportunities for Parker in the manufacture of parts for arms and other military equipment. He at once began to bid for war contracts on behalf of Parker." Parker was not equipped to do forging and other similar work which would be required in the fulfilment of such

contracts. Priest learned that Snell Manufacturing Company, Inc., a New York corporation which owned a plant in Sturbridge and a "forge shop" and whose principal business was the manufacture of bits for boring purposes, was in bankruptcy. In July, 1940, he agreed with the trustees in bankruptcy to buy its assets and good will including the right to use its name for $18,500. Snell was organized by Priest to take over this business when the purchase was completed. Priest paid the trustees $500 in cash and borrowed $30,000 from a bank from which sum he paid the balance of $18,000. Snell then acquired the property from Priest for the amount paid by him to the trustees and made its payment to Priest by giving a note secured by a mortgage on the property purchased. Priest subscribed for 501 shares of the 1,000 authorized shares of the new corporation and paid for them $11,500 with the money remaining from his bank loan. The mortgage note of Snell to Priest was soon paid and the proceeds were used by Priest to liquidate his loan from the bank.

In April, 1941, Priest negotiated a contract for Parker with Savage Arms Corporation to manufacture 333,000 bayonets and 333,000 each of front and rear gun sights for a total price of $1,824,600 of which approximately $888,600 was for bayonets. A substantial part of the work upon the bayonets was subcontracted by Parker to Snell. Parker received an advance payment of $300,000 and "loaned and advanced" to Snell $104,590.73 to enable it to improve its plant and to install new machinery. So much of this sum as constituted money lent has been repaid. So much as was a contract advance has been fully accounted for under the manufacturing contract. "This contract for bayonets was profitable both to Snell and to Parker. The latter received a 5% profit on all work turned over to Snell. It could not have done that work in its own plant." Snell has never paid dividends.

On May 28, 1941, Priest organized Gun Sight to take over from Snell a part of its plant and to take by subcontract from Parker a part of the gun sight portion of

the Savage Arms contract. Of the 330 shares issued by Gun Sight, Priest subscribed for 166 shares at $50 per share, his wife for 2 shares, and others for the remaining shares. In order to purchase his shares Priest borrowed $8,300 from Plating, which company in turn obtained this sum by a bank loan. To facilitate this loan the directors of Parker voted to subordinate any claim Parker had against Plating to the claim of the bank against Plating on account of this loan. Both of these loans have been fully repaid. On July 11, 1941, Gun Sight purchased from Snell the latter's "forge shop." Parker subcontracted to Gun Sight a part of its contract with Savage Arms and certain other war contracts. "These subcontracts were advantageous to Parker, since they involved a profit to it and permitted its plant to be devoted at its full capacity to other manufacturing contracts." Dividends were paid by Gun Sight from April 30, 1943, through April 30, 1946. Snell and Gun Sight maintained their manufacturing plants at Sturbridge but Parker at its Worcester plant furnished these corporations purchasing, administration, and sales services "for which they each paid compensation determined subject to the approval of Priest as majority shareholder of these corporations." Until August 31, 1947, total payments for these services were made by Snell in the amount of $58,570.99 and by Gun Sight in the amount of $17,789.64. There was no evidence that these payments "were unreasonably low or that they were not fixed in good faith."

"These four separate corporations established and set up as stated in this report were operated together as a single enterprise under the general management and control of Priest as majority stockholder of each of them. The details of the operations of the business of each of them were kept entirely separate. This included their contracts with each other and with outside customers and their accounting systems. Except for the over-all control by Priest and the interlocking directorates they were independent. In the war years Parker's business increased enormously and was largely confined to the manufacture of parts for arms and

other war equipment. This new business was obtained largely by the activities of Priest. It became necessary to provide new tools and equipment for the plant. . . . In addition to what has already been stated it turned over much manufacturing work to Snell and to Gun Sight and also made use of Plating through various subcontracts." Since the war years its business has become more nearly normal in character and extent, consisting of the manufacture and sale of some of the items previously produced by it and of many new lines. It has developed an extensive line of garden and other tools. Its surplus increased from $63,286 in 1938 to $513,582 in 1946. Except in 1937 it paid no dividends from 1931 to 1942, inclusive, but from 1943 through 1948 paid dividends totaling $62,150.

Undoubtedly Priest's relation to Parker was fiduciary and his paramount duty was to protect the interests of the corporation. *Beaudette* v. *Graham*, 267 Mass. 7, 12. *Durfee* v. *Durfee & Canning, Inc.* 323 Mass. 187, 196. *Production Machine Co.* v. *Howe*, 327 Mass. 372, 377–378. A director cannot be allowed to profit personally by acquiring property that he knows the corporation will need or intends to acquire, but the "legal restrictions that rest upon officers in their acquisitions are generally limited to property in which the corporation has an interest already existing, or in which it has an expectancy growing out of an existing right, or to cases where the officers' interference will, in some degree, prevent or hinder the corporation in effecting the purposes of its creation." *Lincoln Stores, Inc.* v. *Grant*, 309 Mass. 417, 421. If there is property which is necessary for the business of the corporation, and which the officer knows the corporation desires to acquire and intends and is able to purchase and pay for, in order to protect and develop its business interests, it would be a violation of his duty for him secretly to purchase that property, for the purpose either of afterwards selling it to the corporation at an advanced price and thus taking advantage of its necessities, or of using such property otherwise to the injury of the corporation. *American Circular Loom Co.* v. *Wilson,*

198 Mass. 182, 206. *Durfee* v. *Durfee & Canning, Inc.* *supra.*

The master has not reported his conclusions as to whether there were breaches of fiduciary duty in Priest's acquisition of these business opportunities for himself rather than for Parker but has referred these questions to the court to be decided as matter of law on the subsidiary facts which he has found. See *Ryder* v. *Donovan*, 282 Mass. 551, 554. From these facts it appears that on the death of his father in 1931 Priest found himself manager and in practical control of a business which was not in good condition. It was wholly owned by himself and the members of his family. He "began to make efforts to improve the situation." The plating plant of Jorjorian was acquired in 1933 to remedy an unsatisfactory condition relating to the plating of certain articles manufactured by Parker. Plating was a process which Parker was not equipped to perform and which customarily was performed for it by others. Jorjorian's plating business did not compete with Parker and Parker did not need to acquire it for its protection. Undoubtedly it would benefit Parker to have available a plating plant where reliable work would be done expeditiously. It was for that reason that Priest made his arrangement with Jorjorian. Referring to the plaintiff's contention that Priest should have acquired the plating plant for Parker, the master states, "It should be noted that the plant . . . was at its acquisition that of an independent concern, that apparently it was necessary to pay the purchase price to the previous owner in part at least in shares of the corporation acquiring it, that in addition cash was needed, that Parker was engaged in a business of an entirely different character, and that there is no evidence that the seller wished to become connected with Parker or to take the risk of its business by substituting his plant for Parker's stock." It is commonly known that business in general was then greatly depressed, and if Priest could have acquired the plating plant for Parker it is questionable whether he would have acted to the best

interest of Parker in expanding its activities at that time into such new field. The matter was one for the exercise of business judgment, and if Priest erred in making Plating his personal venture we think it was an error of judgment for which he is not accountable. *United Zinc Co.* v. *Harwood,* 216 Mass. 474, 476. *Abbot* v. *Waltham Watch Co.* 260 Mass. 81, 96. *Brown* v. *Little, Brown & Co. (Inc.)* 269 Mass. 102, 117.

The distinction between the act of a fiduciary which simply indicates lack of good judgment and one which approximates fraud and constitutes a breach of trust is important in considering the acquisition by Priest of the forging plant later taken over by Snell. Priest began to bid for contracts to manufacture parts of arms and military equipment shortly after the war commenced in 1939. His bids were made on behalf of Parker. Being aware that Parker was not equipped to do forging, he took advantage of an opportunity to acquire the forging plant in July, 1940. This was approximately nine months before he obtained the Savage Arms contract for Parker. It does not appear that Parker needed a forging plant except to make possible the performance of war contracts which later it might obtain. The purchase of the forge shop from the trustees in bankruptcy was in the circumstances a speculative venture. The decision to purchase the plant having been made by Priest, his further decision not to hazard the capital of Parker in the purchase, if an error of judgment, was not, we think, a breach of trust. By the subcontract to Snell of a part of the later contract effected with Savage Arms, Parker realized substantial benefits from the acquisition of the forging plant without having incurred the risk of investing its own money in the purchase.

As to the incorporation of Gun Sight the master reports: "For some reason which does not clearly appear, Priest decided to transfer to a new corporation a part of the plant of Snell and to subcontract to such new corporation rather than to Snell at least a part of the gun sight portion of the

Savage Arms Corporation contract with Parker. Priest planned to retain for himself the majority of the stock of the proposed new corporation but intended to give others, particularly stockholders, officers and employees of Parker, an opportunity to subscribe for stock." His sisters were told of this plan and the plaintiff, having expressed a desire to obtain some of the stock, was allotted 6 shares. Later she changed her mind and the certificate for the shares was cancelled. Gun Sight was established in May, 1941, after Parker's contract with Savage Arms was executed. The contract appeared to offer opportunity for profit to Parker and also to Snell through the latter's subcontract from Parker. Gun Sight was an enterprise entered into by Priest not for the benefit of Parker but in the interest of individual stockholders and employees of Parker. It was essentially an assignee of a portion of the Snell business. It took over a part of the Snell plant and obtained from Parker a subcontract which would otherwise have gone to Snell. Parker was not affected. There is nothing to show that it did not realize the same percentage of profit from the Gun Sight subcontract which it had been receiving on the subcontracts to Snell. The transaction concerning Gun Sight discloses no breach of fiduciary duty.

Priest's earnings from the acquisition of the businesses hereinbefore discussed have been derived from salaries openly authorized by the directors of Plating, Snell, and Gun Sight and from the dividends paid by Gun Sight. He has received no secret profits. Parker has profited from its dealings with the corporations which he organized. In these dealings it is found that Priest has acted in good faith. In our opinion there is no basis for holding him to be a constructive trustee for Parker of his stock in Plating, Snell, and Gun Sight. By reason of this conclusion it is unnecessary to consider the plaintiff's contention that in some instances the salaries paid to Priest by these three corporations were excessive.

During the years 1940 to 1946, inclusive, Priest received from Parker by way of salaries and bonuses $10,600 in 1940,

$21,800 in 1941, $30,685.78 in 1942, $35,827.27 in 1943, $35,681.98 in 1944, $35,636.36 in 1945, and $26,000 in 1946. Priest was the controlling executive in full charge of all of Parker's activities. His duties "increased in extent and responsibility as the business developed, particularly as it went into extensive war work. In addition to the more normal duties as president and controlling executive, he performed the duties ordinarily performed by a plant superintendent, a works manager, a personnel director and to a substantial extent a sales manager, particularly in the case of special war contracts. In supervising the preparation of the Parker plant for war work he controlled the purchasing of new equipment to the extent of $400,000. He was chiefly responsible for obtaining many special contracts for manufacturing and supplying war goods and for the more exacting work of performing those contracts under very difficult conditions. He devoted his full time without limitation to the business of Parker and its associated companies, often working until late at night and on occasions working all night to solve a difficult problem. This work required much travelling. He produced successful results. There was no strike or other labor problem in any of these companies and any difficulties of production appeared to have been to a large extent solved. The business of Parker increased greatly in volume. Its employees increased in number from about 75 in 1931 to a peak of 424 at the height of the war years. Parker's net sales since 1940 for the fiscal years ending August 31 were" $661,068.09 in 1940, $1,002,123.42 in 1941, $2,084,050.39 in 1942, $2,460,150.09 in 1943, $2,783,454.53 in 1944, $4,106,476.74 in 1945, and $1,227,302.39 in 1946. "The sales for 1940 were the highest up to that year in the history of the company." The master found that the above salaries and bonuses were not unreasonable and not in excess of the fair value of the services rendered to Parker by Priest in the years in which they were paid. He stated that in reaching this conclusion he had considered the previous assignment by Priest of his patent rights to Parker. These patents enabled Parker to manufacture the items so pat-

ented during some of the years in question. "Business done under these patents was substantial and profitable to Parker but I have given no specific value to it. I have treated it merely as one of the services performed by Priest for Parker as a part of the entire benefit to it from his services as president."

Subject to the objection and exception of the plaintiff he permitted Priest to put in evidence through an accountant computations of Priest's net earnings after taxes from his total salaries received from all the corporations. He stated, "I have not given any definite measured effect to these figures but I have taken them into consideration in a general way as a part of the problem which was before the directors in fixing salaries."

The question of what is reasonable compensation for the performance of executive duties by an officer of a corporation is one of fact, *Meyer* v. *Fort Hill Engraving Co.* 249 Mass. 302, 306; *Cook* v. *Cook,* 270 Mass. 534, 541; *Sagalyn* v. *Meekins, Packard & Wheat Inc.* 290 Mass. 434, 439, the fairness of the compensation being open to examination in equity for the benefit of the corporation. *Stratis* v. *Andreson,* 254 Mass. 536, 539. A salary must bear a reasonable relation to the officer's ability and to the quantity and quality of the services he renders. Responsibilities assumed, difficulties involved, and success achieved are matters to be considered. See *Cook* v. *Cook,* 270 Mass. 534; *Bates Street Shirt Co.* v. *Waite,* 130 Maine, 352, 359–362; *Francis* v. *Brigham Hopkins Co.* 108 Md. 233; *Seitz* v. *Elite Laundry Co.* 152 Minn. 469; *Riddle* v. *Mary A. Riddle Co.* 142 N. J. Eq. 147; *Gallin* v. *National City Bank,* 152 Misc. (N. Y.) 679, 703; *Blish* v. *Thompson Automatic Arms Corp.* 64 Atl. (2d) (Del.) 581.

The master's conclusion that Priest's compensation during the years in question was not excessive and unreasonable is supported by his findings of subsidiary facts. We are aware of no satisfactory standard by which the value of the peculiar services rendered by Priest to Parker can be accurately measured. The history of the corporation under

Priest's management indicates that its development into a profitable enterprise was due mainly to his vision, skill, and labor. His compensation properly could be based to some extent on the profits resulting to the corporation from his efforts. Complaint is made that the master took into consideration the prior assignment of patent rights of Priest to the corporation and the net amount of Priest's salaries after the payment of income taxes. In his report the master considered the prior assignments of patents only generally as steps taken by Priest in the development of the corporate business. In determining the value of Priest's services from 1940 to 1946, we think that his prior efforts to build up the business could not be disregarded. There was no error in receiving evidence of Priest's net earnings. The effect of taxes on the income of the individual, as well as on the income of the corporation, is properly to be considered in determining the reasonableness of salaries paid. See *Riddle v. Mary A. Riddle Co.* 142 N. J. Eq. 147.

The plaintiff filed twenty objections to the master's report which under the rule have become exceptions. Exceptions 1 to 8, inclusive, refer to findings of fact by the master to which the plaintiff objects as being incomplete or inaccurate. Exceptions 1 and 2 relate to the issuance of stock by Plating; 3 relates to the advance of $300,000 by Savage Arms to Parker; 4 to the loan and advance of $104,590.73 by Parker to Snell, which loan is alleged to have been in a larger amount; 5 to the payment of $8,300 by Priest from money lent to him by Plating to purchase shares in Gun Sight; 6 to the subcontract of Parker to Gun Sight; 7 to the loans and advances made by Parker to the other three corporations; and 8 to the refusal of the master to make a specific requested finding of fact as to the business of Parker, Snell, and Gun Sight since the war. The plaintiff requested a summary of the evidence bearing on many of these findings and filed a motion supported by affidavit to recommit the report in order that the master might append to the report such requested summaries.

"Whether, or how far, findings of fact made by a master

shall be subjected to analysis by recommitting the case to him with directions to report subsidiary facts or evidence by which the correctness of his findings in point of fact may be tested, is discretionary with the court that appointed him." *Epstein* v. *Epstein,* 287 Mass. 248, 254. *Chamberlain* v. *Henry,* 263 Mass. 63, 65. Rule 90 of the Superior Court (1932) does not provide a means by which a party can compel a master to report additional subsidiary facts. That is a matter that lies in the discretion of the court. *Buckley & Scott Utilities, Inc.* v. *Petroleum Heat & Power Co.* 313 Mass. 498, 508. The master in this case has made a full and careful report of the facts upon which our decision depends with sufficient subordinate facts to enable us to determine whether his conclusions were correct. *E. Kronman, Inc.* v. *Bunn Bros. Inc.* 265 Mass. 549, 555. *Parker* v. *Simpson,* 180 Mass. 334, 356–357. *Cook* v. *Scheffreen,* 215 Mass. 444, 448. There was no error in overruling the above exceptions. Exception 9, relating to the findings in reference to dividends for the years 1947 and 1948 and to the reason why Parker paid no dividends in 1946, and exception 10, to a statement by the master of his reasons for reopening the hearing to permit the receipt of additional evidence relating to Priest's salaries, seem of no materiality. Exception 11 is to the master's ruling that, if the plaintiff has any rights with reference to the compensation paid by Plating, Snell, and Gun Sight, she must assert those rights through Parker after she has established that Parker has rights in or against those corporations. If the ruling was incorrect, which we do not intimate, it is of no importance as the master has reported fully the compensation paid by these corporations to Priest. Exception 12 is to the failure to report in detail a compilation presented by a witness called by the plaintiff of salaries paid to their officers by several small companies. The master was not required to report the evidence received from any particular witness. *Carleton & Hovey Co.* v. *Burns,* 285 Mass. 479, 484. Exceptions 13 and 14 relate to the statements of the master concerning his consideration of the

assignment of Priest's patents and his income taxes. We have already dealt with this matter. It is unnecessary to consider exceptions 15 and 16 which relate to compensation paid to Priest by Plating, Snell, and Gun Sight. Exceptions 17, 18, 19 and 20 concern the defendants' plea of laches, which by reason of the conclusion which we have reached has not been considered in this opinion.

In our opinion there was no error in entering the interlocutory and final decrees.

*Interlocutory decrees affirmed.*

*Final decree affirmed with costs of appeal.*