Lewis F. RUETZ, Plaintiff-Appellant,

v.

Alex R. TOPPING, Robert L. Topping, Donald Topping, and Mound City Screw Products Company, a Corporation, Defendants-Respondents.

No. 33529.

St. Louis Court of Appeals, Missouri.

March 24, 1970.

------◆------

Alfred J. Rathert, Fenton, for plaintiff-appellant.

Greensfelder, Hemker, Wiese, Gale & Chappelow, Henry A. Lay, James L. Hawkins, St. Louis, for defendants-respondents.

DOERNER, Commissioner.

Plaintiff, a minority stockholder in the Mound City Screw Products Company, brought this action against the majority stockholders and the corporation. Plaintiff's petition, as amended, contained three counts. In Count I plaintiff prayed that the court decree the liquidation of the company; in Count II plaintiff sought in a derivative capacity to recover from the individual defendants for the benefit of the corporation compensation paid to the individual defendants alleged to have been excessive; and in Count III plaintiff sought to recover from the company sums purportedly due plaintiff under a termination agreement. The trial court entered judgment in favor of the individual defendants on Counts I and II, and dismissed Count III, without prejudice. After an unavailing motion for a new trial plaintiff appealed.

When the Mound City Screw Products Company was incorporated in Missouri in 1945, 30 shares of its capital were issued for $100 per share to each of its original shareholders. They consisted of plaintiff, Adolph Weber, Alex R. Topping, and his two sons, Robert and Donald. However, at the time of trial there were 250 shares outstanding of which plaintiff and Weber each owned 50, Alex owned 21, Robert 60 and Donald 69. The primary business of the company, which is located in the City of St. Louis, has always been the manufacturing of specialty screw machine products. Alex served as president from 1945 until 1967, Robert as vice-president from 1945 to 1967, and plaintiff and Weber as treasurer and secretary, respectively, from 1945 until 1964. Those four, together with Donald, comprised the Board of Directors from 1945 until 1964. From 1967 until the time the trial was held Robert was president and treasurer, Donald was vice-president and secretary, and those two, together with Alex and his wife, comprised the Board of Directors.

Plaintiff's undisputed testimony was that from the inception of the company it was agreed that the four stockholders who were actively engaged in the operation of the company, namely, plaintiff, Alex, Robert and Weber, were each to receive a salary of $125 per week, and that the profits remaining after the payment of expenses were to be divided equally between them. However, plaintiff testified that even in the early days of the company's existence he noticed that the checks for the additional compensation as made out by Alex would be in the same amount for plaintiff and Alex, but in a lesser amount for Robert and Weber. Plaintiff introduced into evidence five resolutions adopted by the Board of Directors between 1946 or 1947 and 1953, the substance of which were that Alex, as president of the company, was authorized to determine the amounts of additional compensation to be paid to the officers, consistent with the earnings of the company for the prior year. Plaintiff conceded on cross-examination that in some years which he was not asked to name, the company paid dividends on its stock. After 1953 and un-

til 1966, according to both plaintiff and the defendants who testified, Robert and Donald, the salaries and additional compensation were set by Alex, for himself, plaintiff, Robert and Weber, and after 1962, for Donald. Plaintiff conceded on cross-examination that he along with the others, had given Alex authority to fix all compensation, and that in his opinion the compensation paid to all of the officers of the company were commensurate with the duties they were performing, and were fair and reasonable, at least up until 1962.

In that year Donald became an employee of the company, at a salary of $150 per week, which was, of course, more than the $125 per week being paid to the four officers. Also, according to plaintiff's uncontradicted testimony, after Donald became an employee the total amount of the bonuses or additional compensation as divided by Alex was split four ways, one-fourth each being paid to Alex, Robert, and Donald, and one-eighth each being paid to plaintiff and Weber. Plaintiff testified that he asked Robert why his share had been cut and that of the three individual defendants increased, and that Robert's explanation was that Alex had been figuring wrong the last sixteen years. So far as the record shows that is the only time plaintiff ever raised any question about the compensation paid to the individual defendants prior to the time he instituted this action.

According to Donald, on or about June 18, 1964, he, Alex and Robert held what he termed an informal meeting of the Board of Directors at lunch on that day, and decided that plaintiff should be asked to resign. No reason for that decision appears in the record. Later that same day Robert asked plaintiff to resign, and was told, in effect, that if plaintiff did not resign he would be fired and would thereby lose the benefits to which he was entitled under a termination agreement. Plaintiff thereupon executed a written resignation as an " * * * employee and officer of Mound City Screw Products Company," effective as of June 18, 1964. The record shows that Weber executed a similar resignation on the same day.

Following the resignations of plaintiff and Weber, Alex continued the policy of determining the compensation paid to himself, Robert and Donald, at least up until some time in 1966, when at an informal meeting of the Board of Directors held by the three of them at the home of Alex it was agreed that Alex would receive a salary of $200 per week, that Robert and Donald would each receive one of $500 per week, and that thereafter no bonuses or additional compensation would be paid. Plaintiff filed this action on August 19, 1966. Robert testified that that meeting between the three individual defendants was held in August, 1966, and that plaintiff's lawsuit, " * * * probably came up, I would think" at that meeting. Thus it is a fair inference that the agreement to discontinue the payment of additional compensation and to pay only flat salaries resulted from the institution of this action by plaintiff.

Alex was hospitalized with a blood clot on his lung and a kidney infection in May, 1966, and remained in the hospital for a period of approximately six to eight weeks. Thereafter he remained in a convalescent state at home, until some time after the meeting held in August, 1966. During that period Robert and Donald conferred with Alex two or three times a week on matters of business. Some time after the meeting Alex suffered a flare-up of the kidney infection, which caused a deterioration of his health. He came to his office two or three times a month until May, 1967, when he retired and thereafter took no active part in the operation of the company. Thereafter he received $180 per month, apparently under the termination agreement.

Robert, as stated, has worked full time for the company since it began doing business in 1949, but the record is far from clear as to the nature of his duties between that date and the illness of his father. The

testimony indicates that since then, and at the time of trial, Robert has had responsibility for the bookkeeping and accounting procedures, purchasing of supplies and keeping of inventory records, some sales work, personnel, and in part for production and quality control. As stated, Donald was employed by the company in 1962 and appears to have directed his efforts more towards the shop and sales side of the business rather than the administrative side of the company. He updated production methods and procedures, became responsible for estimating and layout for the automatic screw machines, supervised a second shift from September, 1964 to May, 1967, and for a nine months period conducted a class to teach layout procedures to employees.

Plaintiff has made no complaint regarding the judgment rendered against him on Count I, nor does he properly present any point regarding the court's action in dismissing, without prejudice, Count III of his petition. The points relied on in his brief are confined to his claim in Count II that the compensation paid to the individual defendants was excessive. Both parties concede, and the trial court held, that in accordance with our decision in Binz v. St. Louis Hide and Tallow Co., Mo.App., 378 S.W.2d 228, the burden was on the individual defendants to justify the compensation they had received, and to show the reasonableness thereof, since as directors they had participated in the determination of the amount thereof. In its findings of fact and conclusions of law the court found that, "* * * the individual defendants have sustained said burden of proof," which finding is the subject of plaintiff's first point on appeal. The court also held that, "Plaintiff is barred by his acquiescence, laches and agreement from now complaining of company policies established during his tenure as an employee of the Company. Saugh (sic) v. Busch, et al., 403 S.W.2d 559 (Mo.Div. 2, 1962)." Plaintiff for his second point maintains that the court likewise erred in so finding. Since it is apparent from the briefs of the parties that there is a difference of opinion between them as to the construction to be placed on that finding, one of which, if sustained, would make it unnecessary to pass upon the reasonableness of the compensation paid, we will consider the points in their inverse order.

■ Plaintiff construes the last quoted passage as a ruling by the court that plaintiff was barred from complaining of the *amount* of the compensation which had been paid to the individual defendants. On the other hand, the individual defendants interpret it to mean that plaintiff was barred from complaining about the *manner* in which their compensation was determined, that is, the continuation of the policy of allowing Alex to determine the amounts to be paid to each of the individual defendants and the holding of informal rather than formal meetings of the Board of Directors. We agree with the individual defendants' construction of the court's finding for, as they point out, had the trial court held that plaintiff was barred from questioning the amounts paid to the individual defendants it would not have been necessary for the court to further hold, as it did, that defendants had sustained their burden of proof as to justification and reasonableness of the compensation paid to them. We do not agree that merely because plaintiff acquiesced in the informal manner in which compensation was determined while he was an employee-officer-director that plaintiff was necessarily barred from questioning the manner of such determination after he ceased to occupy those positions and became only a minority stockholder. But since the decisive question is whether the individual defendants sustained their burden of proof we proceed to a consideration of that issue.

■ As the individual defendants concede that burden cast on them was, "* * * to justify their salaries and show the reasonableness thereof," Binz v. St. Louis Hide and Tallow Co., Mo.App., 378 S.W.2d 228, 230. In his petition plaintiff did not

limit his complaint regarding excessive compensation to any period, and as drawn he appears to question all of the compensation paid to the individual defendants since the company was organized in 1945. We are of the opinion, and hold, that our inquiry in that regard should not extend farther back than June 18, 1964, the day upon which plaintiff was given the choice of resigning or being discharged. This for the reasons that plaintiff agreed to and helped formulate the policy by which Alex was authorized to fix the amount of additional compensation paid to each officer; as treasurer he had full knowledge of the amounts so paid; he received and accepted the additional compensation allotted to him; and other than the inquiry mentioned, addressed to Robert he acquiesced in and never objected to the amounts paid. In fact, as stated, he testified that the compensation paid to all of the officer-employees was fair and reasonable, and commensurate with their duties, at least until Donald was employed in 1962, and even after that then he made no real objection. Of course, after plaintiff was forced to resign as an officer and employee his status was that of a minority stockholder, and he was not barred from questioning on behalf of the corporation the compensation thereafter paid to the individual defendants.

What are the factors commonly considered in determining whether a particular salary or compensation paid to an employee was or was not reasonable? Neither side has discussed or cited a single authority as to the standards or guides to be employed, and our own research has disclosed that cases dealing with that subject are by no means abundant. It is said that, like the reasonableness of an attorney's fee, the reasonableness of the compensation paid to an employee is a question of fact. Black v. Parker Mfg. Co., 329 Mass. 105, 106 N.E.2d 544; Smith v. Dunlap, 269 Ala. 97, 111 So.2d 1; Pacific Grains, Inc. v. Commissioner, 9 Cir., 399 F.2d 603. Ordinarily, like an attorney's fee, it is not subject to a precise determination by any known mathematical formula; there is no hard and fast rule to be used in deciding what is reasonable in all cases and each must be decided on its own facts and circumstances. Unlike the determination of a reasonable attorney's fee, where the elements which may properly be considered are specified in our Civil Rule 4.12, V.A.M.R., no authority has been found which undertakes to give an all-inclusive statement of the factors which may properly be used in arriving at a conclusion as to the reasonableness of an employee's compensation.

This is not to say that we are wholly without some guidelines, for the question of what is reasonable compensation, especially at the executive level, has received attention from both the text writers and the courts. Fletcher, in his Cyclopedia Corporations, Vol. 5, Section 2133, p. 577, quotes from a New York case that:

" 'To come within the rule of reason the compensation must be in proportion to the executive's ability, services and time devoted to the company, difficulties involved, responsibilities assumed, success achieved, amounts under jurisdiction, corporate earnings, profits and prosperity, increase in volume or quality of business or both, and all other relevant facts and circumstances.' "

Section 162(a) (1) of the Internal Revenue Code, 1954, allows a corporation to deduct as an ordinary and necessary expense in carrying on a business "a reasonable allowance for salaries or other compensation for personal services actually rendered," and that provision has proven to be a more prolific source of litigation as to what was or was not reasonable compensation. In that area, also, no set formula has been devised, and as in Mayson Mfg. Co. v. Commissioner, 6 Cir., 178 F.2d 115, various factors to be considered are mentioned: the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross

income and the net income; the prevailing general economic conditions; a comparison of salaries with distribution to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years.

■ Judged by the tests and standards as to reasonableness of compensation referred to in the foregoing authorities, did the individual defendants sustain the burden of proof cast upon them by Binz? We hold that they did not. We reach that conclusion not only on the basis of what was developed in the evidence, but also because of what was not shown by the defendants. For example, the parties stipulated as to the correctness of a tabulation introduced in evidence which showed the compensation paid to Alex, Robert and Donald each month during the years 1962 to February, 1968, inclusive. An examination of those figures for the year 1964 shows that the following was paid by the company to each individual defendant:

|  | Alex | | Robert | Donald |
|---|---|---|---|---|
|  | Regular | Additional | Total | Total |
| January | 625 | | 625 | 750 |
| February | 500 | | 500 | 600 |
| March | 625 | 340 | 1075 | 850 |
| April | 500 | | 965 | 965 |
| May | 500 | | 500 | 600 |
| June | 500 | | 800 | 850 |
| July | 700 | | 1000 | 1250 |
| August | 725 | | 800 | 1000 |
| September | 700 | | 800 | 1000 |
| October | 875 | | 1000 | 1250 |
| November | 700 | | 800 | 1000 |
| December | 875 | | 1000 | 1250 |

Prior to plaintiff's resignation on June 18, 1964, plaintiff's duties were those of superintendent of the screw machine department. It is apparent that immediately after plaintiff's departure from the company the monthly compensation paid to each of the three individual defendants, particularly that of Donald, was substantially increased. No justification or explanation for those increases in their compensation was offered. All of them had been employed on a full time basis prior to plaintiff's resignation. Were the duties of each of them changed or increased in any way? There was no evidence to that effect. On the contrary, there was testimony that at some unspecified time an employee named Jim Stroup was given the responsibility of overseeing the operation of the shop, presumably the duty which plaintiff theretofore performed. And there was also testimony by Robert that an employee named John Campbell performs some of the work formerly performed by Weber. It can scarcely be claimed that the company was enjoying any wave of prosperity at the time the increases were granted, for according to the corporation's 1964 Federal income tax return, introduced as an exhibit, its net taxable income for that year was only $422.14.

A somewhat similar observation may be made regarding the flat salaries that were agreed upon by the three individual defendants at the meeting held in Alex's home

about August, 1966, after plaintiff had filed this suit. The stipulation regarding compensation previously referred to reveals that the amounts paid to each of the three individual defendants in 1966 were as follows:

|  | Alex | | Robert | Donald |
|---|---|---|---|---|
|  | Regular | Additional | Total | Total |
| January | 600 | 100 | 1000 | 1000 |
| February | 600 | 100 | 1000 | 1000 |
| March | 750 | | 1250 | 1250 |
| April | 600 | 100 | 1500 | 1500 |
| May | 700 | | 1700 | 1200 |
| June | 875 | 125 | 2000 | 2000 |
| July | 700 | 125 | 1700 | 1700 |
| August | 700 | 125 | 1700 | 1700 |
| September | 975 | | 2300 | 2300 |
| October | 800 | | 2000 | 2000 |
| November | 800 | | 2000 | 2000 |
| December | 1000 | | 2500 | 2500 |

As is readily apparent from those figures, the result of changing the policy from discretionary amounts theretofore determined by Alex to that of flat salaries was a substantial increase in the compensation paid to Robert and Donald. For while they had received an average amount of $1481.25 and $1418.75, respectively, for each month from July to August, inclusive, for the last four months they each received an average amount of $2200 per month.

It is argued that those increases in the compensation paid to Robert and Donald were justified because they were then doing all of the work formerly performed by five officers; and because the total amount paid to Alex, Robert and Donald in the years after plaintiff's resignation bore a smaller ratio than in those years before his resignation. What Robert actually testified was that he and Donald were, " * * * doing the work that five men had done previously *on the executive level.*" (Emphasis supplied.) Plaintiff and Weber, while nominally officers, devoted their activities to the shop during the period of their employment and so far as the record shows did no work at the executive level, so that in any valid comparison a fair portion of their compensation (the total of which was not shown) should be attributed to the shop, not officer's salaries. Furthermore, it must be remembered that Robert's testimony was that employees Stroup and Campbell were performing in part the work which had previously been done by plaintiff and Weber.

It is true, as the individual defendants point out, that the total amount of compensation paid to all five officers in 1957 was $40,000, or 27.5 percent of the company's gross income, whereas the total amount paid to the three individual defendants in 1967 was $52,300, or only 17.3 percent of its gross. But the undisputed testimony of plaintiff was that prior to his resignation in 1964 the policy being followed was that of disbursing all or substantially all of the profits of the company in the form of additional compensation to the officers as determined by Alex; and since the individual defendants reject the suggestion that they had that result in mind when they fixed their flat salaries in 1966, the difference in policy may account for the difference in the percentages. Furthermore, while a comparison of compensation paid by the company in prior years is one of the

factors to be considered in determining reasonableness, as mentioned in Mayson Mfg. Co. v. Commissioner, supra, it is only one of many. And even the factor of compensation in prior years does not support the arguments of Robert and Donald, for the largest amount previously paid to any officer in one year from 1962 to 1964 was $14,590, paid to Alex in 1966.

As a preface to our discussion of other factors referred to in Fletcher and Mayson Mfg. Co., which were not developed in evidence we have prepared the following tabulation from the company's Federal income tax returns for the years 1957 to 1966, inclusive, and from the figures supplied by the individual defendants for 1967, omitting cents:

| Year | Sales After Returns | Cost of Operations | Gross Income | Officers Compensation | All Other Deductions | Net Taxable Income | Taxes | Net Income After Taxes |
|------|------|------|------|------|------|------|------|------|
| 1957 | 145,514 | 92,462 | 53,241 | 40,000 | 9,995 | 3,246 | 974 | 2,272 |
| 1958 | 141,591 | 90,333 | 51,580 | 40,000 | 11,253 | 1,019 | 298 | 721 |
| 1959 | 200,687 | 125,554 | 75,133 | 52,000 | 15,998 | 7,134 | 2,252 | 4,882 |
| 1960 | 208,318 | 133,769 | 74,548 | 53,675 | 17,232 | 3,640 | 1,092 | 2,548 |
| 1961 | 179,546 | 110,098 | 69,448 | 49,600 | 15,870 | 3,977 | 1,193 | 2,784 |
| 1962 | 199,898 | 124,053 | 75,844 | 55,250 | 15,447 | 5,147 | 1,544 | 3,603 |
| 1963 | 197,721 | 125,976 | 71,744 | 51,300 | 16,837 | 3,607 | 1,082 | 2,525 |
| 1964 | 191,539 | 136,014 | 55,525 | 37,710 | 17,428 | 387 | 85 | 302 |
| 1965 | 223,106 | 166,116 | 56,990 | 35,975 | 21,589 | (574) | none carry back | (574) |
| 1966 | 321,758 | 227,630 | 94,127 | 51,200 | 39,670 | 3,257 | back | 3,257 |
| 1967 | 302,164 | | 74,500 | 52,300 | | (39,000) | none | (39,000) |

———◆———

The fundamental weakness of the individual defendants' approach, in our opinion, was their failure to present any evidence showing a comparison between the compensation paid to the defendants and that paid to executives having similar duties in comparable companies in the same industry. In fact, when Robert was asked by plaintiff's counsel regarding the salaries set in August, 1966: "Did you determine how much is being charged in industry for comparable work to what you and your brother were doing?" Robert answered, "No." An expert witness called by defendants, Andrew C. Ries, a certified public accountant, experienced in preparing and reviewing corporate income tax returns, in answer to a hypothetical question, expressed the opinion that salaries of $26,000 per year paid by the company to Robert and Donald were reasonable. We note, however, that while the question pro-

pounded hypothesized the gross volume of sales, it was devoid of any reference to net profits, the ratio of officers' salaries to sales or profits, and other factors. And no comparison with officers in any comparable company was mentioned.

An analysis of the figures contained in the above tabulation shows that since 1964 the ratio of officers' compensation to sales has ranged from 14.3 percent to 17.3 percent. How do those figures compare with those of comparably sized and situated companies in Mound City's industry? The figures likewise show that the net taxable income to sales has ranged from nil, as when the company suffered losses in 1965 and 1967, to a high of only about 2.4 percent in 1959. What is the ratio of profits to sales in other comparably sized and situated companies in the industry? The figures further show that while sales have

increased about 50 percent from 1964 to 1967, there has been no corresponding increase in profits during that time, and, in fact, losses in two of those four years. Have the results experienced in comparably sized and situated companies in the industry paralleled those of Mound City, or have they been more profitable? And lastly, the same figures show that despite the net loss of $36,000 sustained by the company for 1964 to 1967, inclusive, the officers' salaries increased approximately 40 percent between those years. If the reasonableness of an executive's salary may be gauged to some extent by the success achieved, as stated in Fletcher, the foregoing figures furnish little if any justification or substantiation of the reasonableness of the salaries paid to the individual defendants since 1964. For the cold, hard facts are that during those years, and particularly since Robert and Donald have managed the company, not only has it failed to pay any dividends to its stockholders, but it has sustained a very substantial over-all loss. We have not overlooked the explanation given by defendants for the loss sustained in 1967, but even if the result obtained for that year's operation is disregarded entirely the company has scarcely been a profitable enterprise, at least so far as the corporation and its minority stockholders are concerned.

For the reasons stated the judgment as to Count II of plaintiff's petition is reversed and the cause as to that Count is remanded for a new trial.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of this court. Accordingly, judgment reversed as to Count II of plaintiff's petition and cause remanded for new trial as to that Count.

WOLFE, P. J., and BRADY and DOWD, JJ., concur.