201 F.Supp.2d 1012 (2002)
Gary Lee ECKELKAMP, et. al., Plaintiffs,
v.
Dennis J. BESTE, et. al., Defendants.
No. 4:00-CV-687 SNL.
United States District Court, E.D. Missouri, Eastern Division.
March 12, 2002.
*1013 S. Sheldon Weinhaus, Weinhaus and Dobson, St. Louis, MO, Gary D. Greenwald, Ann Marie LaBue, Shayne and Greenwald Co., L.P.A., Columbus, OH, for Plaintiffs.
Robert J. Tomaso, Richard H. Kuhlman, Blackwell Sanders Peper Martin, LLP, St. Louis, MO, for Defendants.

MEMORANDUM
LIMBAUGH, Senior District Judge.
Plaintiffs have filed this lawsuit contending that due to the actions of the individual defendants[1] (hereinafter referred to as the Executive Defendants), plaintiffs have been deprived of the full value of benefits under the Melton Machine and Control Company Employee Stock Ownership Plan (hereinafter referred to as the Melton Machine ESOP). More specifically, the plaintiffs contend that the Executive Defendants *1014 breached their fiduciary duties as trustees of the Melton Machine ESOP by paying themselves (as corporate officers of Melton Machine and Control Company) unreasonable and excessive salaries, bonuses, and other benefits, thereby allegedly causing the underpayment of dividends to Melton Machine ESOP participants (including the plaintiffs) and/or the undervaluation of the Melton Machine ESOP's stock in annual appraisals.[2] This matter is before the Court on the collective defendants motion for summary judgment (# 45), filed July 23, 2001.[3] This ERISA cause of action was set for a bench trial on the Court's trial docket of March 11, 2002.
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). With these principles in mind, the Court turns to an examination of the facts.[4]
Melton Machine and Control Company (hereinafter referred to as MMCC) was founded in the early 1970s[5] by Vernon *1015 Melton in Washington, Missouri. From the 1970s to 1985, the primary business of MMCC was the manufacturing of automated are welding machines for use in the bicycle and furniture industries. From its inception through 1985, Vernon Melton and his wife, Alberta Melton, owned all shares of MMCC.
In 1985, MMCC employed approximately twenty (20) employees, including defendants Gary Rufkahr[6], Dennis Beste[7], and Don Martin[8], and generated approximately $2 million in revenue. Two significant events occurred in 1985 which dramatically changed the course of MMCC and the future for its employees. Vernon Melton was diagnosed with terminal colon cancer and despite a great deal of interest by third-parties to purchase MMCC, his desire was to sell his company to his employees. However, the employees lacked the sufficient funds to purchase the company outright. For approximately a year, Melton, Rufkahr, Martin, and the company's accountant, Jerry Germain, investigated and educated themselves on the possibility of the employees purchasing the company through the creation of an ESOP (Employee Stock Ownership Plan). Ultimately, the Melton Machine and Control Company Employee Stock Ownership Plan was created with defendants Rufkahr, Beste, and Martin as the Trustees. The ESOP agreed to engage Menke and Associates to administer the ESOP. Menke recommended that the stock of Melton Machine be appraised by Everett Mathews. On October 9, 1985 Mathews appraised the stock of Melton at $1.2 million for a marketable minority interest and $1.5 million for an entity value basis.
Negotiations continued for the sale of the company to the employees. Vernon Melton wanted to sell the company for $1.5 million; Rufkahr negotiated a sale price or $1.4 million, with Vernon Melton pledging $500,000.00 as collateral for the loan of $1,125,000.00 obtained by the ESOP. Meanwhile, between the time of the appraisal by Mathews and the March 1986 closing of the sale of the company, the sales for MMCC increased substantially primarily through Rufkahr's efforts. New customers, including Walker Manufacturing[9], were attracted by a change of focus in the company from the bicycle and furniture industry to the automotive industry. For its fiscal year 1986 (ending September 30, 1986), MMCC had approximately $3.4 million in sales, an increase of almost 50% over 1985 fiscal year sales of $2.3 million.
The sale of the company to the employees involved the ESOP purchasing all shares of MMCC from the Meltons. The purchase was financed by a transfer of most of the funds from MMCC's Employee Profit Sharing Plan and a ten-year term *1016 loan to the ESOP[10]. The ESOP pledged the shares as collateral for the loan. The effective date of the ESOP was October 1, 1984 and is administered in accordance with the MMCC Employee Stock Ownership Plan Document.[11] Prior to the closing of the sale of MMCC, Rufkahr and Martin agreed to enter into covenants not to compete for a five-year period, without receiving any consideration for these agreements.
From 1984 to 1989, MMCC made cash contributions to the ESOP annually. These contributions were used to repay the ESOP's indebtedness. As each loan payment was made, blocks of pledged stock shares were released to the ESOP and allocated to each participant's individual company stock account in the ESOP.[12] By 1989, the indebtedness was retired and 100% of the pledged stock had been released and allocated. Thus, since 1989 the ESOP has owned all issued and outstanding shares of MMCC stock.
In addition to wages and benefits, MMCC provides its employees with two (2) separately defined contribution plans: the Money Purchase Pension Plan (MPPP) and the ESOP. Within the ESOP are two (2) accounts: the Company Stock Account (CSA) and the Other Investment Account (OIA). The CSA contains shares of Melton stock held by the ESOP for the benefit of the account holder/participant. The OIA contains cash and marketable securities used, in part, to facilitate the reallocation of stock to the various CSAs, as Melton stock becomes available for reallocation.[13]
Since 1989 (and to the present), MMCC has continued to make cash contributions based upon ERISA's statutory formula and applicable IRS regulations. The statutory and regulatory proscribed formula(s) prohibit the defendants from any modification so as to allocate a disproportionate share of stock to their individual CSAs. The ERISA formula and applicable IRS regulations take into account MMCC's annual profits. These cash contributions are allocated each year to participants OIAs in the ESOP. In addition to these cash contributions, MMCC also pays dividends annually to the ESOP which are passed directly through to the ESOP's participants.
Under the terms of the ESOP, employees become eligible for participation in the ESOP on October 1, after working at least 1000 hours in the Plan year. The allocation formula is based upon a participant's level of eligible compensation. The total maximum dollar contribution that can be made on behalf of any employee cannot exceed $30,000.00, regardless of the employee's income.[14] For the fiscal year 2000, the average MMCC non-managerial *1017 production employee received a total ESOP and MPPP contribution of $24,600.00. Based upon the average level of compensation and ESOP contribution (slightly less than $30,000.00), employees with the greatest number of years of service have more shares of stock allocated to their CSA than newer employees with fewer years of service.
Only 100 shares of MMCC stock have ever been issued and allocated to ESOP participants. Since the allocation of such stock is strictly limited to the occurrence of a triggering event[15] and governed by firm governmental rules and regulations, it is common for the majority of participants CSA accounts to contain only fractional shares of stock. Given these allocation restrictions, (at the end of MMCC's fiscal year 2000) 34 current employees had interests of less than one share of stock in the ESOP.[16] The three currently employed Executive Defendants have an interest in almost 30 shares of stock. Only eight (8) employees have an individual interest in more than five shares of stock in the ESOP. Four (4) employees (including defendants Rufkahr and Beste) have an interest in approximately 39 shares of stock; and nine people with the largest interests in the ESOP have an aggregate interest of more than 69 shares of stock.
As of September 30, 2000 MMCC's average production employee with at least one year of service (excluding the Executive Defendants) had $349,560.00 in his or her ESOP and MPPP accounts. The twenty (20) largest accounts (excluding the Executive Defendants) averaged $717,938.00. For fiscal year 2000, MMCC contributed almost $1.3 million to its employees ESOP and MPPP accounts.
Over a period of fifteen (15) years[17], MMCC has grown to almost sixty (60) employees, with annual sales of over $20 million. Its pretax profits (after distribution of dividends) for fiscal year 2000 was $1.7 million. The rate of return of the stock in MMCC (including dividends) has increased, on average, by 20% per year. For fiscal year 2000, a single share of MMCC stock was worth $109,000.00.
After fifteen (15) years of employment with MMCC, plaintiff Kampmann left MMCC with approximately $723,000.00 combined in his ESOP and MPPP accounts. Similarly, after almost fifteen (15) years of employment, plaintiff Hoemann left MMCC with approximately $478,000.00 combined in his ESOP and MPPP accounts.

Annual Appraisals of MMCC Stock
Since 1985, Everett Mathews has been annually appraising MMCC stock.[18] He has visited the MMCC facility at least twice over this time-period. Prior to his annual appraisal, Mathews reviews updated financial statements and interviews defendant Rufkahr as to its current customer list, works in progress, and future potential work contracts. Mathews sends a preliminary draft of his appraisal to Rufkahr for review and to discuss any questions that Rufkahr may have pertaining to the draft appraisal.
*1018 Mathews appraisal of the stock is not intended to reflect the value of the stock as if MMCC were being sold to a third party; instead, his appraisal is intended to reflect a per-share fair market value for a limited number of shares of a closely-held company for ESOP purposes. Mathews values the stock of MMCC on a marketable minority interest basis because no single employee/participant has an interest representing more than fifteen percent (15%) of the shares of the company. He does not use a control premium[19] in valuating MMCC stock because he is valuing the interest of each individual participant, and no single participant has effective control of the company or ESOP shares. In general, Mathews appraisal methodology for MMCC stock has been to take MMCC's pretax earnings, multiply them by 3, and add MMCC's excess working capital. He has used the same multiplier (3) every year for his appraisal. The size of the multiplier is inversely related to a company's level of risk; i.e. the higher risk the lower the multiplier. He uses a multiplier of 3 to reflect the fact that approximately 80% of MMCC's business is concentrated in only five (5) customers. This concentration of business has not changed over the years, thus, to achieve consistency, Mathews has chosen to keep the multiplier at 3.
Finally, Mathews does not make an adjustment to the earnings of Melton based upon the direct cash compensation and dividends paid to the employees because such payments are consistent and are expected by the employees to continue each year. However, he does make an adjustment for the contributions made to the ESOP.

Executive Defendants Work History and Compensation
Shortly after founding MMCC, Vernon Melton hired defendants Martin and Rufkahr.[20] In the early years, MMCC's business focused on manufacturing electrical control panels, then to the manufacturing of automated arc welding machines for use primarily in the bicycle and furniture industries.
By 1985, Rufkahr succeeded Vernon Melton as President of MMCC; Martin had risen to become Vice-President and Secretary of MMCC. The company employed fewer than twenty (20) employees and had little more than $2 million in revenue. However, by 1986, Rufkahr had begun to implement changes to increase revenue.
A significant change was in the company's business focus from the furniture and bicycle industries to the automotive industries. Rufkahr, Beste[21], and Martin sought out new customers such as Walker *1019 Manufacturing (now known as Tenneco Automotive), which is presently one of MMCC's biggest customers. With a new focus on an industry requiring on-going development of products which could be continually modified according to market demands, Rufkahr changed MMCC's production methods from one-time engineering with a low profit margin to production methods allowing for continual development of engineering systems from job to job which provided for a better product which was more cost-efficient.
Furthermore, for the first time, active marketing efforts were put in place. Rufkahr implemented wholesale changes in MMCC's marketing practices. Field sales representatives made frequent visits to customer plants, made technical presentations, and participated in trade shows. Customers were encouraged to visit MMCC's facility to see equipment in operation and to view prototypes in production.
Presently, Rufkahr, Beste and Folkmann bear sole responsibility for making all sales for MMCC, including frequent hosting of representatives of current and potential customers.[22] They target accounts and markets, formulate bids, and engage in field service as well as customer training. In addition to sharing responsibility for sales, the current management team have other duties related to the daily operation of MMCC. Rufkahr acts not only as MMCC's Chief Executive Officer, but also as the Chief Financial Officer. His responsibilities include not only production and administration, but also payroll decisions. Beste oversees engineering, production, and administration. Folkmann supervises production, and is involved in human resources for the company.[23]
The Executive Defendants receive a base salary, plus bonuses. The amount of the yearly bonus is dependent upon personal and company performance for the year.[24]. None of the Executive Defendants carries product liability insurance. Each is a participant in the ESOP and currently owns shares of MMCC stock.[25] For fiscal year 2000, Rufkahr, Beste, and Folkmann worked 2874, 2914, and 2775 hours, respectively. During the last five years, only one other employee (not one of the plaintiffs) has exceeded the work hours of any one of the Executive Defendants. For fiscal year 2000, the base compensation (including overtime) for the Executive Defendants was: Rufkahr  $96,713.00; Beste  $90,248.00; and Folkmann  $78,562.00.

Annual Stockholders Meeting of February 17, 2000
Each year, as required by ERISA and the ESOP, a meeting is held with MMCC management and all employees/participants to discuss the company's yearly performance and matters concerning the ESOP, such as Mathews annual stock value appraisal and the value of the employees interests in the ESOP and MPPP. Up until February 17, 2000 the meetings were routine, and no employee ever inquired *1020 about compensation levels (including the Executive Defendants compensation) or questioned Mathews appraisal.
Sometime in January 2000, Greg Cox, an employee and friend of plaintiff Kampmann removed certain confidential documents pertaining to compensation from Rufkahr's briefcase. With this information in hand, Cox circulated at the February 17th meeting a Public Notice divulging this information and asking for the Executive Defendants resignations as Trustees of the ESOP.[26] In response to this Public Notice, approximately forty-two (42) of MMCC's employees (excluding the Executive Defendants and the plaintiffs) circulated a response petition which vehemently expressed their outrage at the Public Notice as follows:
This notification is in response to the PUBLIC NOTICE dated September 17, 2000 which was distributed at the annual meeting of stockholders of Melton Machine and Control Company on Thursday, February 17, 2000.
We, the undersigned Employee Stockholders of Melton Machine and Control Company do not agree with, am appalled by, and strongly disagree with your PUBLIC NOTICE. We object to you including us in your accusations and requests.
As Employee Stockholders we are concerned about the continued success of this company, our jobs and our futures. Such drastic reconstructuring, as you propose, could have detrimental affects [sic] on Melton Machine and Control Company and, thus, on our lives.
Whoever is responsible for and agrees with the PUBLIC NOTICE, we want you to know that we do not want you here, undermining this company, the present management, our jobs and our futures. If you are not happy here, the door is open for you to leave! PLEASE GO!!!
Defendants Exhibit U.

Termination of Plaintiff Kampmann's Employment
In December 1999 MMCC moved its production and administrative facilities into a new building in Washington, Missouri. Instead of putting confidential payroll information on the computer during the move, Rufkahr kept compensation documents in his briefcase. Sometime during the move, Greg Cox (without permission) entered Rufkahr's office and removed said documents from Rufkahr's briefcase. MMCC instituted an investigation into the theft and questioned several employees, including plaintiff Kampmann.
Although Kampmann was aware of the fact that Cox had taken the documents, he failed to disclose this to the investigators. Kampmann also advised Cox not to come in and talk to the investigators. Although MMCC's management eventually discovered that Cox had taken the documents and had issued the Public Notice criticizing the Executive Defendants and calling for Rufkahr's resignation, MMCC did not discharge Cox. Instead, Cox voluntarily resigned, effective March 16, 2000.
*1021 Meanwhile, the Executive Defendants decided to terminate Kampmann's employment due to a history of job performance problems and (what they believed to be) his attempt to undermine the investigation of the theft of the confidential documents. The Executive Defendants met with Kampmann to inform him of their decision. The decision to terminate Kampmann's employment was memorialized in a letter sent to him, dated March 13, 2000.
Plaintiffs allege that the Executive Defendants have breached their fiduciary duty to the ESOP by paying themselves excessive salaries. They contend that by approving excessive compensation for themselves, the Executive Defendants have purposefully caused the undervaluation of the Melton Machine stock; thereby, resulting in the underpayment of dividends to the plaintiffs ESOP accounts. They seek removal of the Executive Defendants as Trustees of the ESOP and appointment of an independent fiduciary, and damages (to be paid to the ESOP) representing a disgorgement of ill-gotten profits by the Executive Defendants[27]. Finally, they seek attorneys fees and costs.
An ESOP is a type of ERISA plan that invests primarily in the stock of the employer company creating the plan. As with any other ERISA plan, ESOP trustees or fiduciaries are required to adhere to certain standards of performance; i.e. they are required to manage and administer the ESOP pursuant to the prudent man rule and the exclusive benefit rule. Under ERISA § 404(a)(1)(B); 29 U.S.C. § 1104(a)(1)(B) an ESOP fiduciary must discharge his or her duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. Under ERISA § 404(a)(1)(A); 29 U.S.C § 1104(a)(1)(A) an ESOP fiduciary must discharge his or her duties for the exclusive benefit of plan participants and their beneficiaries, and for the purpose of defraying the expenses of administering the plan. A similar requirement exists under ERISA § 403(c); 29 U.S.C. § 1103(c) wherein the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan. A co-fiduciary is also liable for another fiduciary's breach if s/he participated in the breach, enabled the breach by failing to maintain the prudent man standard, or has knowledge of the breach by the co-fiduciary and fails to take steps to remedy the breach. ERISA § 405(a); 29 U.S.C. § 1105(a). Finally, if a fiduciary fails to meet the standards of ERISA § 404, s/he may be held personally liable for any losses to the plan resulting from the breach. ERISA § 409(a); 29 U.S.C. § 1109(a).
The first issue that must be addressed before even considering the existence of any breach by any one or all of the Executive Defendants is whether the Executive Defendants qualify as fiduciaries with respect to the setting of compensation levels.
ESOPs are unique creatures in that there will always exist an overlap between corporate conduct and fiduciary duties. Since the nature of ESOPs requires it to be heavily invested in the corporate employer's stock, rarely will a corporate act *1022 not have some impact upon the value of the stock held by the ESOP and therefore, on the value of the ESOP plan assets. Congress expressly intended that the ESOP would be both an employee retirement benefit plan and a technique of corporate finance that would encourage employee ownership. Martin v. Feilen, 965 F.2d 660, 664 (8th Cir.1992) (citations omitted); see, Brown v. American Life Holdings, Inc., 190 F.3d 856, 860 (8th Cir.1999) (Congress intended to permit an ESOP to be used as a technique of corporate finance as well as a retirement benefit plan for employees.); Herman v. Mercantile Bank, N.A., 143 F.3d 419, 426 (8th Cir.1998) (Congress created ESOPs as a statutory pension program designed to promote investment of employee retirement assets in the stock of the employer.) (Bright, J. dissent). While corporate conduct and fiduciary responsibilities may be linked, not all corporate acts are fiduciary acts. Virtually all of an employer's significant business decisions affect the value of its stock, and therefore, the benefits that ESOP plan participants will ultimately receive. However, ERISA's fiduciary duties under § 1104 attach only to transactions that involve investing the ESOP's assets or administering the plan. A broader rule would make ESOP fiduciaries virtual guarantors of the financial success of the plan. Martin v. Feilen, at 666 (citations omitted).
ERISA recognizes the dual capacity that many corporate officers serve in that they will act both as a fiduciary to the ESOP and as the employer or management personnel of employer. Nothing in ERISA prohibits a corporate officer from acting as a fiduciary at times and acting in the best interests of his or her employer at other times. Adams, et. al. v. LTV Steel Mining Co., 936 F.2d 368, 370 (8th Cir.1991); Hickman v. Tosco Corp., 840 F.2d 564, 566 (8th Cir.1988); see also, Lockheed Corp. v. Spink, 517 U.S. 882, 890, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996); ERISA § 408(c); 29 U.S.C. § 1108(c). The question is whether the corporate officer was acting as a fiduciary as that term is defined under ERISA. A person is an ERISA fiduciary only to the extent that:
(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,
(ii) he renders investment advice for a fee or other compensation ..., or
(iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.
ERISA § 3(21)(A); 29 U.S.C. § 1002(21)(A). This limiting language releases the employer or employer's representatives, who are also fiduciaries to a plan, from the fiduciary standards of care and loyalty when they are acting in their corporate capacities, rather than in their fiduciary roles. Reich v. Hall Holding Co., 990 F.Supp. 955, 959 (N.D.Ohio 1998). Clearly then, for persons having dual roles, the threshold requirement for fiduciary status under ERISA is discretionary authority or control regarding management of the plan or its assets. However, this definition is not all-encompassing. A court must still inquire as to whether a person is a fiduciary with respect to the particular transaction or conduct at issue. Maniace v. Commerce Bank of Kansas City, N.A., 40 F.3d 264, 267 (8th Cir.1994); Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 61 (4th Cir.1992); Brown v. American Life Holdings, Inc., 64 F.Supp.2d 882, 893 (S.D.Iowa 1998), aff'd 190 F.3d 856 (8th Cir.1999). In the instant case the transaction in question concerns the setting of compensation levels; i.e. salaries.
*1023 Generally, matters concerning compensation are within the purview of corporate management or a Board of Directors. See, § 351.310 R.S.Mo.; Putnam v. Juvenile Shoe Corp., 307 Mo. 74, 269 S.W. 593 (1925); Broski v. Jones, et. al., 614 S.W.2d 300 (Mo.App.1981); see also, Local Union 2134, United Mine Workers of America v. Powhatan Fuel, Inc., 828 F.2d 710 (11th Cir.1987); Gelles v. Skrotsky, 983 F.Supp. 1398 (M.D.Fla.1997) aff'd 189 F.3d 484 (11th Cir.1999). Setting compensation levels is a business decision or judgment made in connection with the on-going operation of a business. An employer's discretion in determining salaries is a business judgment which does not involve the administration of an ERISA plan or the investment of an ERISA plan's assets. Such a decision may ultimately affect a plan indirectly but it does not implicate fiduciary concerns regarding plan administration or assets. Business decisions can still be made for business reasons, notwithstanding their collateral effect on prospective, contingent employee benefits. Adams v. LTV, at 370 quoting Dzinglski v. Weirton Steel Corp., 875 F.2d 1075, 1079 (4th Cir.1989). Under ERISA, an individual acts in a fiduciary capacity only to the extent that s/he exercises discretionary control or responsibility over plan administration or assets. The discretion required to invoke ERISA's fiduciary obligations must relate to fiduciary functions such as plan management or administration. A business decision regarding salary levels does not meet this requirement.
In the instant case, MMCC's by-laws confer the responsibility of setting compensation levels to MMCC's President, subject to the oversight of the Board of Directors. Thus, the financial affairs of MMCC as it relates to salaries is clearly a corporate matter involving the furtherance of the business of MMCC. It does not implicate a fiduciary duty under ERISA. Thus, the Executive Defendants were not acting in their fiduciary capacities when compensation levels were determined for themselves and the other employees of MMCC.
Assuming arguendo that the Executive Defendants determination of compensation levels was conduct governed by ERISA's fiduciary standards (i.e., Executive Defendants were acting as fiduciaries when setting compensation levels), the affirmative evidence before this Court establishes that no breach of fiduciary duty occurred. A breach of fiduciary claim involves a three-step analysis. Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 917 (8th Cir.1994); Martin v. Feilen, at 671. An ERISA plaintiff bears the burden of proving a breach of fiduciary duty and a prima facie case of loss to the plan. Roth, 16 F.3d at 917; Martin, at 671. The burden of persuasion then shifts to the fiduciary to prove that the loss was not caused by, nor any profits to the fiduciary attributable, to the breach of duty. Roth, 16 F.3d at 917; Martin, at 671. Finally, [a]s the party moving for summary judgment, however, the trustees can prevail only by demonstrating the absence of a genuine issue of material fact either on elements of the claim for which the plaintiffs bear the burden of persuasion at trial or on elements for which the trustees themselves bear the burden of persuasion at trial. Roth, 16 F.3d at 917.
In the instant case, it is important to understand the exact nature of the alleged breach and loss to the plan. Plaintiffs contend that the setting of compensation is a fiduciary duty owed to the ESOP and that the Executive Defendants breached this duty by awarding themselves excessive compensation. They further allege that the loss to the plan was an undervaluation of the ESOP stock. Upon careful *1024 review of the parties pleadings, submitted exhibits, and relevant caselaw, the Court finds that plaintiffs have failed to prove a breach of a fiduciary duty, and furthermore, have failed to demonstrate a loss to the plan.
There is no dispute that the Executive Defendants are paid very well. The credible evidence indicates that they are paid approximately 56% above the median; however, this fact alone does not establish a breach due to excessive compensation. The question remains as to whether or not the Executive Defendants breached ERISA § 404's standard of care when setting their salaries.
The plaintiffs support for their allegation of a breach rests primarily upon a report by Dan Callahan of ComStock Valuation Advisors. In his report, Callahan concludes that the Executive Defendants were excessively compensated on the basis of a comparative study analysis using nine (9) other companies. Plaintiffs Exhibit 15 (ComStock Valuation Report as of September 30, 1999). After careful review of Callahan's credentials and his report, the Court finds the report unpersuasive on this issue.
Mr. Callahan lacks any formal training or education in compensation matters.[28] His primary job responsibility is in valuing businesses, although executive compensation is one factor he considers in valuing businesses. He appraises about ten (10) ESOP companies a year outside of St. Louis; however, he has only authored one appraisal of a St. Louis area company  MMCC. He performed his appraisal of MMCC without ever visiting the MMCC facility in Washington, Missouri or speaking with any of the MMCC employees. He relied on discovery materials supplied by the plaintiffs counsel for information regarding MMCC. The methodology employed by Callahan was not even his customary practice; i.e., he normally prefers to visit a site and talk with management and employees in order to gain an understanding of the business operations. Callahan Deposition, pgs. 43-44.
MMCC is a closely-held company owned by its employees (including the Executive Defendants) pursuant to the provisions of an ESOP. Callahan reached his conclusions regarding excessive compensation based upon a comparative study analysis using nine (9) publicly-held companies. Out of these nine companies, he specifically compared the Executive Defendants compensation to the executive compensation at three (3) of these companies. He did not research the job duties or contributions to the companies made by the sample executives; he simply relied upon their job descriptions. Furthermore, he did not personally attempt to determine the actual daily work contributions made to MMCC by the Executive Defendants. Callahan did not consider the impact of long-term incentive and employee benefits paid to the Executive Defendants as part of their compensation; thus, he did not consider the fact that a portion of the compensation paid to the Executive Defendants was in the form of bonuses directly tied to company performance. Callahan's analysis of the Executive Defendants compensation did not include any comparison between MMCC's non-management employees's compensation with the compensation of similar employees at the comparable companies. Thus, even though the Executive Defendants salaries may be 56% above the median, MMCC's non-management employees *1025 are paid on average 125% above the median.[29]
Interestingly, he failed to consider the fact that out of the nine companies he chose to compare to MMCC, six (6) of these companies provided higher compensation to their executives than the compensation paid to the Executive Defendants. Finally, he failed to consider that none of the nine comparative companies performed nearly as well as MMCCnot one came close to matching MMCC's average annual 20% increase in stock value (in fact, several of the comparative companies actually had posted losses during some years).
The Executive Defendants compensation levels are reviewed annually by Jerry Germain, MMCC's outside accountant for over thirty (30) years. Unlike Callahan, Germain is intimately acquainted with MMCC's operations. When compared with other similar privately-held companies in the St. Louis area, Germain concludes that the Executive Defendants compensation is not only reasonable, but that their base salary is actually low. Executive Defendants Exhibit B  First and Second Affidavits of Jerry Germain. He found that the internal compensation ratio; i.e. the ratio of compensation paid to management personnel to the compensation paid to non-management personnel was substantially lower for MMCC than the other companies (MMCC's internal compensation ratio is approximately 6:1, while the internal compensation ration of many of Germain's other privately-held corporate clients is 12:1).
The Executive Defendants employed the services of Watson Wyatt to address the issue of allegedly excessive compensation. Watson Wyatt is a well-established company that routinely does executive compensation surveys. In fact, Callahan relied on Watson Wyatt's annual executive compensation survey as a resource for determining appropriate market compensation. Callahan Deposition, pgs. 124-25. In preparation for analyzing the Executive Defendants compensation, Watson Wyatt personnel toured MMCC's facilities in Washington, Missouri, met and interviewed three of the Executive Defendants, and talked with non-management employees about the company's history, their work assignments, and production activities. Executive Defendants Exhibit N  Cover letter by James P. Sillery on behalf of Watson Wyatt.
Watson Wyatt concluded that the Executive Defendants had not been excessively compensated for their services to the company. Executive Defendants Exhibit O. It concluded that all employees, including the Executive Defendants, were well-paid and received the same benefits.[30] It further found that the internal compensation ratio between the compensation paid to the Executive Defendants and non-management employees was considerably lower than market standards. Specifically, Watson Wyatt found that management base salaries were well below the median (for comparable companies) and total compensation was near the 75% percentile of the market. Part of its analysis included consideration of the company's superior performance from 1985 through 1999.
Watson Wyatt's ultimately concluded the following:
In the period since the ESOP, Melton's stock growth compared favorably with *1026 expected market returns. During this time, Melton has sought to balance employee risk by providing high levels of cash compensation along with these favorable returns. Had Melton chosen an alternative strategy that emphasized higher stock growth and paying lower levels of cash compensation, this strategy would have meant that compensation for all groups, management and non-management would have been paid at market medians. This would have would have [sic] resulted in the following:
* The management team would have received a reduction in cash compensation that was more than offset by increased capital accumulation in the ESOP.
* The non-management employees would have received a significant reduction in pay levels (by as much as half in some cases). Unlike for management, these reductions would typically not be offset by increased capital accumulation in the ESOP.
The clear conclusion is that the management team for Melton was not compensated excessively. In fact, they were not compensated as well as non-management employees. They followed a strategy that provided a Total Direct Compensation package to the employees of the company with job security, a high standard of living through the superior pay package, and the security of an outstanding retirement benefit.
Executive Defendants Exhibit N. Essentially, Watson Wyatt found that if the Executive Defendants had utilized a strategy of paying all employees less; i.e., closer to the median, this would have disproportionately favored the Executive Defendants since they hold a significant number of MMCC shares in their ESOP account.
There is no precise formula or test by which the reasonableness of the compensation of corporate officers is to be measured. ERISA does not contain any test, and the IRS simply considers any level of compensation exceeding 90% over the median to be worthy of investigating. However, the Missouri courts have considered the question and based upon corporate law and tax law, together with IRS regulations, have developed a number of factors to consider. Although these factors should be considered in most cases concerning the reasonableness of compensation, courts are reminded that the reasonableness of employee compensation is not subject to a precise determination by any known mathematical formula; there is no hard and fast rule to be used in deciding what is reasonable in all cases and each must be decided on its own facts and circumstances. Ruetz v. Topping, 453 S.W.2d 624, 628 (Mo.App.1970).
The Missouri Supreme Court has cited with approval the factors considered by the appellate court in Ruetz, supra. Courts should look at the compensation in proportion to the executive's ability, services and time devoted to the company, difficulties involved, responsibilities assumed, success achieved, amounts under jurisdiction, corporate earnings, profits and prosperity, increase in volume or quality of business or both, and all other relevant facts and circumstances. Fendelman v. Fenco Handbag Manufacturing Co., 482 S.W.2d 461, 464-65 (Mo.1972); Ruetz, at 628 (citations omitted). Based upon IRS rulings, Missouri courts also consider the employees qualifications; the nature, extent, and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; a comparison of salaries with distribution to *1027 stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. Fendelman, at 465; Ruetz, at 628-29 (citations omitted).
After careful consideration of the factors discussed in both Fendelman and Ruetz, supra., the Court finds that the Executive Defendants have sustained their burden as to the reasonableness of their compensation.
All of the Executive Defendants have been intimately involved in the daily operation of MMCC.[31] They have worked long hours to make the company extremely successful. The evidence shows that it is through these Executive Defendants efforts that MMCC has successfully navigated a change in business focus and continues to outperform several comparable companies. Since the Executive Defendants have managed the company, compensation levels have been consistently high, profits consistently high, and stock dividends consistently increasing in value.
The plaintiffs approach had a fundamental weakness in their failure to adequately present evidence showing a comparison between the compensation paid to the Executive Defendants and that paid to executives in comparable companies. Unlike Germain and Watson Wyatt, plaintiffs expert Callahan used publicly-held companies, instead of closely-held ESOP companies. He then skewed the comparison by eliminating those companies which had flat profits or decreased profits in the subject years. He failed to show any ratio of officers salaries to sales or profits. He failed to make any comparison between the corporate officers salaries and nonmanagement employees salaries (either for MMCC or the comparable companies). His lack of on-site interviews provided him with little insight into the daily operation of MMCC and the actual contributions that the Executive Defendants made to the company on a daily basis and in the long-term. By failing to consider the salary levels of MMCC's non-management employees, the company's consistent profitable success, and the comparable market, Callahan addressed the issue of the reasonableness of the Executive Defendants compensation in a vacuum. He had to consider the reasonableness of the Executive Defendants compensation in the conduct of the business, and this he did not do. See, Fendelman, supra.; Ruetz, supra.
Germain and Watson Wyatt took into account many of the factors set forth in Fendelman and Ruetz. The comparable companies were similar in business, size and corporate structure. They took into account non-management employees salaries and considered the internal compensation ratio between the Executive Defendants salaries and non-management employees salaries. They were personally acquainted with the operation of the company and the work contribution of the Executive Defendants. They considered the salaries in relation to the company's success rate  both profits and stock dividends.
Plaintiffs have failed to establish a prima facie case of breach of fiduciary duty on account of excessive compensation.
Plaintiffs further attempt to demonstrate a breach of fiduciary duty by *1028 showing that the stock appraisals were not done in a prudent manner, and thus, the ESOP stock was undervalued. Plaintiffs expert Callahan concluded that MMCC stock was undervalued due to several factors including the Executive Defendants alleged excessive compensation.
ERISA does not set forth any specific formula or valuation method a fiduciary must use to determine the value of an ESOP's stock. Appraisals of the value of the stock of a closely-held company is not an exact science. Herman v. Mercantile Bank, N.A., 143 F.3d at 422. Little caselaw exists on valuation, so often a court's conclusion is determined by its evaluation of the credibility and background of the witnesses who performed the valuation. Reich v. Hall Holding Co., 60 F.Supp.2d 755, 760 n. 4 (N.D.Ohio 1999). In the instant case, the parties experts are each qualified to give their opinion; however, their differing valuation methods sets them apart.
Plaintiffs expert, Dan Callahan's methodology included the use of a control premium. He testified that he normally uses a control premium when the ESOP owns 50% or more of the company stock. Callahan Deposition, pg. 35. He defines a control premium as the relevant premium above the minority price an investor would pay in order to gain control over the assets of the company. He began his analysis by reviewing prices paid in corporate acquisitions through the Mergerstat Review research database.[32] He reviewed approximately 2894 transactions from 1990-1998 where a controlling interest was purchased in a publicly-held company. Callahan applied a control premium of 15%; he chose this figure in order to take into account that control premiums are few in this industry and to account for a decrease in executive compensation. However, he offset the 15% control premium by 5% to account for lack of marketability (i.e. shares of a closely-held company are not as easily marketed as shares of common stock of a publicly-held company). Thus, his control premium was actually 10%.
By Callahan's own definition, a control premium is added to reflect the ownership rights associated with a controlling owner's position. Plaintiffs Exhibit 15  Callahan Report, dated September 30, 1999, pg. 75. It represents what a hypothetical buyer would pay extra to a hypothetical seller in order to obtain control of a company. The problem with it is that its use undermines the purpose of an ESOP company because application of a control premium assumes that MMCC were for sale and what a prospective buyer (in this case, Callahan) might pay for a controlling interest in order to make changes to increase profitability. Callahan's use of a control premium hypothetically assumed fair market value based upon changes he believes could be made; i.e, an outside management team brought in, lower compensation levels for all employees, but same productivity levels; therefore, presumed higher profitability. This imagined scenario is too speculative to support application of a control premium in this case. See, Estate of Richard R. Simplot v. Commissioner of Internal Revenue, 249 F.3d 1191 (9th Cir.2001).
The evidence before the Court establishes that there was no hypothetical buyer lurking in the bushes waiting to snap up MMCC. Furthermore, the evidence before the Court establishes that not only was management satisfied with the operation *1029 of the company, but also were the majority of employees.[33] Significant changes in the daily operation of the company or the compensation system were not contemplated for the immediate future. The basis for ESOP valuation will differ depending on whether the block of stock subject to the valuation is of a controlling interest. However, in a controlled ESOP situation wherein no changes are expected to enhance cash flow, [although] technically a control premium may be applied to these transactions, the application of a control premium may not be prudent. Executive Defendants Exhibit B (attached to Reply Memorandum), Pratt, Shannon P, Reilly, Robert F., Schweihs, Robert P., Valuing a Business  The Analysis and Appraisal of Closely Held Companies, (4th Ed.2000), pg. 705.
Another flaw present in Callahan's methodology is his adding back the $450,000.00 paid out to employees in stock dividends (in YR2000). Since these dividends have already been paid out in proportion to the amount of shares in each employee's ESOP account, to add back in the payout in order to inflate the stock value is clearly a duplicative effort. Finally, Callahan makes an adjustment for the alleged excessive compensation paid to the Executive Defendants even though there is no evidence before the Court that MMCC's compensation policies will change.
Analysts sometimes consider an adjustment for excess compensation if some members of management are earning amounts in excess of the market level of compensation. In an ESOP valuation, these adjustments are only appropriate if the compensation policies will be changed to reflect the reduced level of compensation. Even if excess compensation is being paid, if the higher level of compensation is expected to continue, the ESOP valuation should reflect the ongoing compensation practices.
Pratt, Reilly, Schweihs, Valuing a Business, supra., pg. 705.
MMCC's stock's appraised value has been reviewed for the last fifteen (15) years by Everett Mathews. He has performed in excess of forty (4) ESOP appraisals every year. His basic approach is to first review MMCC's updated financial statements, then engage in a lengthy discussion with Executive Defendant Rufkahr about MMCC's past year  updated customer list, work in progress, and potential work in the future. He prepares a draft appraisal which is sent to Rufkahr for Rufkahr to review. Mathews goes over the draft appraisal with Rufkahr to answer the questions that Rufkahr normally asks regarding Mathews findings. Executive Defendants Exhibit G  Affidavit of Everett Mathews.
Mathews appraisal method values MMCC stock on a marketable minority interest basis because no single employee/participant has an interest greater than 15%. His method is not intended to reflect the value of the stock based upon a hypothetical buyer-seller situation, but rather to establish a per-share fair market value for a limited number of shares for ESOP purposes. He does not make any compensation adjustment since it is part of MMCC's historical compensation policy and practice to pay above-median salaries for all employees and this practice is expected to continue. He uses a multiplier of 3 each year to reflect the inherent high risk associated with MMCC's business.[34] *1030 He does not apply an explicit discount for lack of marketability. He does not add back in the $450,000.00 paid out in dividends because (as stated before) the dividend paid each year is in proportion to each ESOP participant's number of shares and to value the shares by adding this amount back in would duplicate the dividend already paid out.
Finally, Mathews does not use a control premium because is presupposes a sale of the company which he considers to be directly contrary to the goals of employee-ownership. Furthermore, he believes it unnecessary since no single participant has effective control of the company or ESOP shares.
In general, Mathews appraisal method has been to take MMCC's pretax earnings, multiply them by 3, and add MMCC's excess working capital. Using this method, the rate of return on MMCC's stock, including dividends, has been approximately 20% per year since 1985. The stock value has increased from $14,000.00 per share in 1985 to $109,000.00 per share in 2000. Executive Defendants Exhibit G  Mathews Affidavit.
Using his methodology, Callahan believes that the per share value of MMCC stock should be $200,000.00 (as of YR2000). However, the credible evidence shows that his methodology is not proper in the context of an ESOP company. He figures in a control premium that is more suitable for use in valuing the stock of a publicly-held company. He figures in alleged excessive compensation to the Executive Defendants which the Court has determined does not exist. He criticizes Mathews use of a multiplier of 3, yet acknowledges that MMCC is a relatively high risk company and fails to cite any authority as to why use of a constant multiplier is inappropriate. Finally, he fails to explain the rationale of adding back in the $450,000.00 paid out in dividends in order to inflate the stock value. It is clear to this Court that paying the cash in dividends to the ESOP participants pro rata based upon individual accounts and then including these same dividends as part of the share value is akin to double-dipping.
After a careful and thorough review of all the documents and pleadings filed in this case, the Court is convinced that there is no material issue of fact regarding any breach of fiduciary duty by the Executive Defendants. Not only have the plaintiffs failed to show that the Executive Defendants were excessively compensated for their work or that any of the Executive Defendants failed to act in a prudent manner with regard to the valuation of MMCC stock, but they have failed to show any loss to the ESOP by any action taken by the Executive Defendants. The undisputed fact is that the ESOP has greatly benefitted by the Executive Defendants actions every year for the last fifteen (15) years. The stock value has increased approximately 20% every year. Few companies, in fact plaintiffs expert could not even find one to compare with MMCC, can boast this kind of corporate success.
All employees were (and presumably, still are) paid remarkably high salaries given their job positions. Even more remarkable is the fact that most, if not all of the employees except for plaintiff Eckelkamp, are completely satisfied with the Executive Defendants management of the company, including salaries and their ESOP accounts. Twelve (12) employees *1031 have voluntarily filed affidavits in support of the Executive Defendants attesting they enjoy the high compensation that they receive, they expect such compensation to continue in the future, and that they are satisfied with the stock valuation each year; they further attest that they realize that a higher stock valuation would mean higher company profits but lower compensation. Executive Defendants Exhibits D, K, V, and X. Furthermore, the Court finds it very compelling that a majority of the employees (43 employees) were so outraged with the Public Notice criticizing MMCC's management that they signed a petition lambasting any notion of restructuring the management of the company and even going so far as demanding that those unhappy with management (presumably the plaintiffs) leave the company. Executive Defendants Exhibit U.
Everyone, including the plaintiffs, has benefitted financially from the management of the company by the Executive Defendants. Salaries are above the median for comparable positions elsewhere, the company has been consistently profitable, and the ESOP stock value has risen 20% every year. The only people to benefit from the plaintiffs alternative management strategy will be the Executive Defendants since they own the most stock. It is incredulous to think any employee who owns only a fraction of a single share of stock would greatly benefit from increasing the stock value, in lieu of lower cash compensation. The fact that the Executive Defendants have also enjoyed high levels of compensation and benefitted from holding a greater portion of stock in their individual ESOP accounts does not make per se a breach of fiduciary duty. ERISA does not require that day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits, be performed solely in the interest of plan participants. Hickman, at 566 quoting Phillips v. Amoco Oil Co., 614 F.Supp. 694, 718 (N.D.Ala.1985) aff'd 799 F.2d 1464 (11th Cir.1986); see also, Flanigan, et al. v. General Electric Co., et. al., 242 F.3d 78, 88 (2nd Cir.2000). Plaintiffs are simply attempting to turn a personal grudge over management style into something sinister.[35]
As stated before, plaintiff Kampmann has an additional claim that he was wrongfully discharged from his employment for exercising his ERISA rights in violation of 29 U.S.C. § 1140; ERISA § 510. He contends that he was wrongfully fired because he questioned the Executive Defendants management of the company and of the ESOP, specifically with regards to the compensation paid to the Executive Defendants. He believes that his protest activities ultimately led to his dismissal.
Under ERISA § 510, an employer may not discharge an employee for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. 29 U.S.C. § 1140; Langlie v. Onan Corp., 192 F.3d 1137, 1141 (8th Cir.1999); Mathews v. Trilogy Communications, Inc., 143 F.3d 1160, 1166 (8th Cir.1998); Kinkead v. Southwestern Bell Telephone Co., 49 F.3d 454, 456 (8th Cir.1995). Claims under ERISA § 510 are analyzed using the three-stage burden-shifting framework common to Title VII, ADEA *1032 and ADA cases. Montgomery v. John Deere & Co., 169 F.3d 556, 561 (8th Cir. 1999); Mathews, at 1166; Kinkead, at 456; Rath v. Selection Research, Inc., 978 F.2d 1087, 1089 (8th Cir.1992). If the claimant is able to establish a prima facie case under ERISA § 510, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. If the employer meets its burden, then the claimant must prove that the proffered reason is pretextual. Montgomery, at 561; Kinkead, at 456; Rath, at 1089-90.
To establish a prima facie case under ERISA § 510, a claimant must prove 1) s/he participated in a statutorily protected activity[36]; 2) that an adverse employment action was taken against him or her; and 3) that a causal connection existed between the two. Montgomery, at 561; Rath, at 1090. The requisite causal connection may be established either through direct evidence of retaliation or circumstantial evidence such as proof that the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive. Mathews, at 1166 quoting Rath, at 1090; Kinkead, at 456.
Kampmann's evidence of a causal connection is the relatively short time between his latest protest of management practices occurring at the shareholders meeting of February 17, 2000 and his discharge on March 13, 2000. This close temporal nexus between Kampmann exercising his ERISA rights by questioning the administration of the ESOP and his termination gives rise to a reasonable inference of retaliatory motive. However, establishing a prima facie case does not establish his ERISA § 510 claim.
Even if Kampmann has established a prima facie case under ERISA § 510 due to the timing of his firing, the Executive Defendants have articulated a legitimate, non-discriminatory reason for his firing and Kampmann has failed to set forth affirmative evidence that this reason is a pretext for interfering with his ERISA rights.
Plaintiff Kampmann was fired subsequent to the shareholders meeting of February 17, 2000 and the investigation of the theft of financial papers from Rufkahr's briefcase. The Executive Defendants assert that Kampmann's firing was in part due to his lack of cooperation in the theft investigation and continuing problems with his work conduct. Executive Defendants Exhibit L. The record shows that throughout Kampmann's work history with MMCC, he had demonstrated a negative attitude towards his job and MMCC. Throughout his employment history at MMCC he had been criticized by his superiors for his negative attitude. Executive Defendants Exhibits F  Affidavit of Randy Folkmann; T  Deposition of Randy Folkmann, pgs. 106; K  Affidavit of Tom Hellebusch; H  Deposition of Plaintiff Kampman, pgs. 140-01, 179, 215, 219. Kampmann had posted his paycheck stubs at his work site in an effort to rebel against the highly [sic] secrecy of the whole company. Kampmann Deposition, pg. 219. He repeatedly made disparaging remarks about management both inside *1033 and outside of the company. Kampmann Deposition, pg. 219.[37]
Finally, the record shows that plaintiff Kampmann was not very cooperative with management regarding the theft of the financial papers. Although he was aware of the theft and was aware that Cox had the papers, he failed to inform management of this information. Kampmann Deposition, pgs. 196-99, 227-28. He had even gone so far as to warn Cox not to come to the plant because employees were being interviewed about the theft. Executive Defendants Exhibit I  Deposition of Gregory Lee Cox, pg. 64; Kampmann Deposition, pg. 200-01.
Kampmann does not deny his behavioral problems or poor attitude at work, he simply minimizes their importance as justification for his termination. He points out that he was given pay raises and had never been threatened with termination before the February 17, 2000 meeting. Kampmann's assertions simply go to the business judgment to fire him, not to the issue of pretext. He fails to set forth any affirmative evidence that MMCC management did not receive complaints about his attitude from customers and fellow workers. He does not deny his animosity towards the Executive Defendants (especially Rufkahr), he does not deny engaging in conduct intentionally meant to stir things up in the workplace, and doesn't deny that although he knew who had taken the financial papers he failed to provide this information to MMCC investigators. His difference of opinion as to the seriousness of his negative attitude and defiant conduct does not create a genuine issue of material fact regarding pretext.[38] The core question in a retaliation case does not, ultimately, concern the veracity of the facts underlying an employer's legitimate discriminatory reason for discharging its employee but rather concerns whether `the employment decision was based upon intentional discrimination' Stuart v. General Motors, 217 F.3d 621, 637 (8th Cir.2000) quoting Ryther v. KARE 11, 108 F.3d 832, 837-38 (8th Cir.1997). This Court's inquiry is limited to whether the Executive Defendants gave an honest explanation for its action. See, Krenik v. County of LeSueur, 47 F.3d 953, 960 (8th Cir.1995). The Court finds that they did so, and Kampmann failed to meet his burden of showing pretext.
The record also contains independent support for finding that plaintiff Kampmann's exercise of his ERISA rights was not the real reason for his firing. The record shows that when Kampmann asked questions at the meeting, Rufkahr answered *1034 them; and when he wanted to see ESOP documents, he was shown them. Kampmann Deposition, pgs. 202-04, 246-47.[39] Plaintiff Hoemann had also asked questions about management practices and requested to view ESOP documents (which he did review) but was not fired. Executive Defendants Exhibit M  Deposition of Bradley Hoemann, pgs. 97-98. In fact, Hoemann admitted that he deliberately tried to get fired (under the mistaken belief that it was the only way to get his ESOP funds) by putting a letter on Rufkahr's desk demanding Rufkahr's resignation as a trustee of the ESOP.[40] Hoemann Deposition, pgs. 159-60. Finally, although it was Cox who committed the theft of the financial papers from Rufkahr's briefcase and circulated the Public Notice calling for the Executive Defendants resignations as trustees of the ESOP and new management of MMCC, he was never fired for these acts; he voluntarily resigned sometime later. Executive Defendants Exhibit J. Plaintiff Kampmann has failed to adequately discredit the sufficient factual allegations as set forth in the Executive Defendants letter of termination.
This case is really nothing more than an ESOP's fable of sour grapes. Upon leaving their employment of approximately fifteen (15) years in non-management positions, plaintiffs Kampmann and Hoemann received retirement benefits in the approximate amounts of $723,000.00 and 478,000.00, respectively. Neither has obtained new employment near the salary range they had previously enjoyed at MMCC. As far as the record shows, plaintiff Eckelkamp's main complaint is that upon seeing the papers stolen by Cox, he believes that he is underpaid in relation to other employees. Plaintiffs Exhibit 10  Deposition of Gary Lee Eckelkamp. They are a disgruntled minority of present and former employees who want changes in management style which would not benefit the ESOP or its beneficiaries. The heart of their allegations goes to disagreement over the management style of the Executive Defendants, not mismanagement of ESOP administration or assets. As hard as they try, they cannot put a legally deficient spin on MMCC's business success, its consistent high rate of return on its stock value, and the overwhelming satisfaction that the majority of employees have with the current management of MMCC and the ESOP. As plaintiff Kampmann admitted he never in his wildest dreams thought that after fifteen years with Melton he'd walk away with approximately $723,000.00. Kampmann Deposition, pg. 62.
Having found no material issues of fact regarding any breach of fiduciary duty by any one of the Executive Defendants, or in regard to the termination of plaintiff Kampmann's employment, the Executive Defendants are entitled to summary judgment as a matter of law.[41]
NOTES
[1] The individual defendants are: Dennis J. Beste, Randy Folkman, Gary L. Rufkahr, and Donald G. Martin. Two additional defendants are: the Melton Machine and Control Company Employee Stock Ownership Plan and the Melton Machine and Control Company. The lawsuit is primarily lodged against the individual defendants; the entity defendants are simply named for remedial reasons due to the nature of the lawsuit.
[2] Plaintiff Ron Kampmann has an additional claim that he was wrongfully discharged from employment in retaliation for exercising his rights under ERISA, § 510.
[3] The filing date of the instant summary judgment motion package is the date of the filing of the notice. The package itself was received by the Court on September 4, 2001.
[4] The Court has determined the relevant material facts in this case from the exhibits and documents filed in this case by the parties, including but not limited to, the affidavits of Gary Rufkahr, Jerry Germain, Everett Mathews, Dennis Beste, Randy Folkmann, Don Martin; as well as the depositions of several individuals. In some instances, the Court will cite to a specific exhibit if the Court deems it necessary.
[5] The various pleadings and exhibits filed in this case all contain different dates for the founding of MMCC: the original complaint cites 1972; the amended complaint cites 1970; the defendants statement of background facts cites 1969, and Exhibit A to the Rufkahr Affidavit (a St. Louis Post-Dispatch Business Section article dated December 24, 1989) cites 1970.
[6] At all times relevant to this lawsuit, defendant Rufkahr was and is President and Treasurer of MMCC, a member of its Board of Directors, and member of the Administrative Committee for the ESOP.
[7] At all times relevant to this lawsuit, defendant Beste was and is Vice-President and Secretary of MMCC, a member of its Board of Directors, and member of the Administrative Committee of the ESOP.
[8] At all times relevant to this lawsuit, defendant Martin was Vice-President and Secretary of MMCC, a member of its Board of Directors, and member of the Administrative Committee of the ESOP. Defendant Martin retired in or about 1995.
[9] Walker Manufacturing became Tenneco Automotive and is presently one of MMCC's biggest customers.
[10] The debt on the note, which was originally a ten-year term, was actually retired by the ESOP within four (4) years of the sale.
[11] There is no dispute that the ESOP qualifies as an ERISA Defined Contribution Plan.
[12] Plaintiff Eckelkamp is currently an employee of MMCC and an ESOP participant; plaintiff Hoemann was employed by MMCC from April 1985 through September 30, 1999 and an ESOP participant; and plaintiff Kampmann was employed by MMCC from February 1985 to March 13, 2000 and an ESOP participant.
[13] Stock becomes available for reallocation upon a triggering event such as retirement, death, disability or separation from employment by an ESOP participant.
[14] This is a combined amount to a participant's MPPP and ESOP accounts. Specifically, on average, annually MMCC makes the maximum contribution allowed by law to a participant's ESOP account (15% of employee's eligible compensation up to a maximum of $30,000.00) and contributes 10% of employee's eligible compensation to a participant's MPPP account.
[15] Such triggering events have been historically low for the company. In the last five years, there have been only two (2) voluntary separations from employment (other than a retirement) and one involuntary separation from employment.
[16] Plaintiff Eckelkamp had approximately three-tenths (.3) of one share in his ESOP account.
[17] 1985-2000.
[18] Mathews does approximately forty (40) annual ESOP stock appraisals per year for corporate clients.
[19] The parties hotly dispute whether the use of a control premium in the stock evaluation process for MMCC is appropriate or not. The problem with this issue is that the parties never really explain to the Court what exactly is a control premium. The best definition appears to be in plaintiffs expert (Dan Callahan) business valuation report wherein he states: The appropriate minority interest discount to be applied for Melton can be obtained by examining the empirical relationship between control premiums and minority interest discounts. To calculate the minority interest discount, we first determine the relevant premium above the minority price an investor would pay in order to gain control over the assets. This premium is called the control premium. Plaintiffs Exhibit 8  Business Valuation: Melton Machine and Control Company, as of September 30, 1999, Issued on February 28, 2001, pg. 75. It does not appear that defendants dispute this definition; only the fact that its use in valuing MMCC stock is inappropriate.
[20] 1971 and 1972, respectively.
[21] Beste joined the company in 1975.
[22] Prior to his retirement in 1995, Martin also assisted in sales.
[23] Folkmann joined MMCC in 1986. He was recruited from Walker Manufacturing by Rufkahr. After Walker Manufacturing threatened retribution, if not litigation, Rufkahr paid Walker a recruiting fee for Folkmann. Walker Manufacturing continued its customer relationship with MMCC, and has become one of its biggest customers.
[24] The Executive Defendants also carry life insurance policies (originally required as a condition to obtaining the loan to buy MMCC) and salary continuation agreements.
[25] As of the date of the instant motion, Rufkahr owned 14.8 shares, Beste owned 9.1 shares, and Folkmann owned 5.1 shares.
[26] As far as the Court can tell none of the parties has filed a copy of this Public Notice with the Court. The Court's understanding as to the nature of this document is gleamed from the parties pleadings and Mr. Cox deposition testimony. The exact wording of this document is not material to the determination of the instant summary judgment motion; its importance is only relevant to the fact that Cox possession of the confidential documents (which provided the catalyst for the Public Notice) prompted an investigation into the theft, which in turn provided one of several alleged grounds for terminating plaintiff Kampmann's employment.
[27] Plaintiff Kampmann has a separate claim for wrongful discharge under ERISA and seeks reinstatement to his former position at his former salary, reinstatement of lost benefits, and reimbursement for lost earnings and benefits.
[28] The material facts regarding Mr. Callahan's background and his appraisal methods, especially as regards MMCC are gleaned from his deposition testimony (as well as his report). Plaintiffs Exhibit 14; Defendants Exhibit P.
[29] Clearly, not only are the Executive Defendants paid well but so are all employees at MMCC.
[30] The only difference that was that the Executive Defendants, in exchange for initial five-year non-compete agreements, were given insurance coverage and salary continuation agreements.
[31] The Court recognizes the fact that Executive Defendant Martin retired in 1995; however, the evidence shows that up until his time of retirement, he was extremely active in the daily operation of the company.
[32] The Mergerstat Review reports public company formal transfers of ownership of at least 10% of a company's equity where the purchase price is at least $1,000,000.00 and where at least one of the parties is a U.S. entity. See, Plaintiffs Exhibit 15  Callahan Report dated September 30, 1999, pg. 75.
[33] In fact, as will be later discussed, it appears that only the three plaintiffs had any misgivings regarding the management of the company.
[34] Approximately 80% of MMCC's business is concentrated with five (5) customers, all of which are in the same industry. This makes MMCC a high risk company. The size of the multiplier is inversely related to the company's level of risk. Mathews considers a multiplier of 3 to be a fair indicator of the level of risk associated with MMCC.
[35] Plaintiffs make it quite clear in their pleadings that they preferred the openness of Vernon Melton's management style to Rufkahr's more formalized corporate management style. They complain that in the old days payroll records were not locked up or kept on the computer. They complain that they were not allowed to see plan documents upon demand; although they were allowed to view any requested documents after work hours.
[36] In this circuit, it is still an open question as to whether ERISA § 510 encompasses informal complaints and protests regarding the administration of an ERISA plan (or in this case, an ESOP plan). See, Langlie, at 1141. However, for purposes of the resolution of the instant summary judgment motion, the Court will assume, without so deciding, that ERISA § 510 provides a claim for retaliation based on plaintiff Kampmann's informal complaints and protests.
[37] In order to create a material issue of fact regarding Kampmann's work attitude and conduct, plaintiffs submit his affidavit. However, this affidavit is replete with Kampmann's speculations about management's motives in making certain corporate decisions, his opinion as to other employees work qualifications and pay in relation to their work, hearsay statements made by other employees allegedly to him, and his expert opinion as to job qualifications for different positions at MMCC. Most troublesome is that statements in his affidavit directly contradict his prior deposition testimony. This affidavit lacks factual support for plaintiff's knowledge as the basis for many of his statements and his affidavit fails to create any genuine issues of material fact. Schiernbeck v. Davis, 143 F.3d 434, 438 (8th Cir.1998); El Deeb v. University of Minnesota, 60 F.3d 423, 428-29 (8th Cir. 1995); RSBI v. Affiliated FM Ins. Co., 49 F.3d 399, 402 (8th Cir.1995).
[38] See, Ostertag v. The Historic Theater Group, Ltd., 221 F.3d 1343 (8th Cir.2000) (unpublished). Although an unpublished opinion, Ostertag aptly illustrates the difference between providing sufficient evidence to challenge directly the basis for an employer's proffered reason for termination and simply attempting to minimize the significance of the offending conduct and attitude which served as the basis for the termination decision.
[39] Again, Kampmann concedes his questions were answered and he was allowed to view documents; however, he believes that Rufkahr should have responded more professionally.
[40] Plaintiff Hoemann was never terminated from his job at MMCC, he voluntarily resigned due to financial problems.
[41] In light of the Court's findings and ultimate determination, summary judgment is also granted to the corporate defendants MMCC and Melton Machine ESOP.